Vol. 279          APRIL TERM, 1919.          455

State ex rel. Pub. Serv. Com. v. Mo. South. Ry. Co.

# THE STATE ex rel. PUBLIC SERVICE COMMIS-SION v. MISSOURI SOUTHERN RAILROAD COMPANY, Appellant.

### Division One, July 9, 1919.

1. **RAILROAD: Mandamus: Compelled Operation.** A railroad company in possession of its road may be compelled by mandamus to operate its road in accordance with the positive requirements of its charter, and mandamus is the proper remedy to compel a railroad to perform a definite duty to the public.

2. ———: **Abandonment of Spur Track: Without Permission.** Since the enactment of the Public Service Commission Act of 1913 a railroad company, engaged in operating a spur or branch line, cannot determine for itself the question· of its right to abandon such line, but it must apply to the Public Service Commission for leave to abandon, and may be compelled by mandamus to continue operating such spurs or branches until the Commission has acted and its order has become final.

3. ———: ———: ———: **Decrease in Freight Rates.** And notwithstanding the Public Service Commission refused to permit the railroad company to charge increased freight rates asked for over the spur tracks it was operating in submission to the Commission, it cannot, without the permission of the Commission, abandon the operation of such tracks on the ground that they cannot be operated profitably at the rates permitted, but its duty is to apply to the Commision for such permission or for such adjustment of the rates over its entire line as will not work a hardship.

4. ———: ———: **Operated at Loss: Confiscation.** That an order of the Public Service Commission or a judgment of court concerning a particular facility or a portion of the line of a railroad company may result in some financial loss does not necessarily bring it in to conflict with the provisions of the Constitution relating to due process of law and equal protection of the laws.

5. ———: ———: **Confiscation: Raised in Mandamus.** In a mandamus brought by the Public Service Commission against a railroad company to compel it to operate certain spur tracks which it has abandoned without permission, the question of whether the order to operate, if obeyed, may result in financial loss to the company and therefore be in conflict with the Constitution, has no place.

456 . SUPREME COURT OF MISSOURI.

State ex rel. Pub. Serv. Com. v. Mo. South. Ry. Co.

Appeal from Jefferson Circuit Counrt.—*Hon. E. M. Dearing,* Judge.

.AFFIRMED.

*J. B. Daniel* for appellant.

(1) The trams in question are not railroads or parts of the railroad of appellant within the meaning of the Public Service Act or any other Missouri statute. Palm v. New Haven & Hartford Railroad Co., 17 N. Y. Supp. 471. (2) Neither the Public Service Commission nor the courts have power to require appellant to furnish transportation not included in the exercise of its franchise. Palm v. Railroad Co., supra; Northern Pacific Railway v. Teratone, 142 U. S. 492; Elliott on Railroads (2 Ed.), sec. 457; People ex rel. Van Dyke v. Colorado Central Railway, 42 Fed. 638; State ex rel. United Railways Co. v. Public Service Commission, 270 Mo. 429. (3) Mandamus is a discretionary writ, and, if the law would warrant its issue in any case to compel a railroad company to perform an act not included in the exercise of its franchise, the granting of the writ in this case was a gross abuse of the discretion of the court. State ex rel. Caster v. Kansas Postal Telegraph-Cable Co., 150 Pac. Rep. 549; State ex rel. Lyons v. Bank, 174 Mo. App. 593; State ex rel. Crow v. Bridge Co., 206 Mo. 74; Merril on Mandamus, sec. 62; State ex rel. Railroad Co., 199 Mo. App. 671. (4) The judgment rendered herein confiscates the property of appellant in violation of Section 1 of Article 14 of the Constitution of the United States and in violation of Section 20 of Article 2 of the Constitution of Missouri.

*A. Z. Patterson,* General Counsel, and *J. D. Lindsay,* Assistant Counsel, for Public Service Commission.

(1) The railroad company's conduct in assuming the functions of a chartered common carrier in the

operation of its branch lines or tracks fixes its responsibility and obligations, and determines its duty to obey the laws applicable to chartered common carriers. Terminal Taxicab Co. v. District of Columbia, 241 U. S. 252; Diamond v. Northern Pac. Railroad Co., 6 Mont. 580; 33 Cyc. 651. (2) A company will be held to be "operating" a railroad within the meaning of regulatory statutes if it runs trains on a track for any purpose. Webb v. South. Mo. Ry. Co., 92 Mo. App. 53. (3) The Public Service Act has conferred upon the Public Service Commission the power to determine whether a railroad branch line or track, long established and operating, should be abandoned. State ex rel. Caster v. Kansas Postal Tel. Co., 150 Pac. 544, P. U. R. 1915E, p. 222; Articles 2 and 3, Mo. P. S. C. Law. (4) Though appellant's operation of its branch lines and spur tracks was conducted at a loss, it should have applied to the Public Service Commission for permission to discontinue such operation, and it was unlawful to c^as^ operation until such permission had been granted. State ex rel. Caster v. Kansas Postal Tel. Co., supra.

BLAIR, P. J.—Upon entry of the order considered in Missouri Southern Railroad v. Public Service Commission, a companion case, appellant attempted to abandon the operation of the spur tracks to which the Commission's order applied. Complaint was made, and the Commission ordered its counsel to institute such legal proceedings as might be effective to compel a continuance of the carriage of freight over the spurs. Counsel thereupon instituted this proceeding by mandamus, and, upon the filing of the return, relator filed its motion for judgment, which was sustained and a peremptory writ awarded. This appeal followed.

The return makes numerous formal admissions and then admits appellant's ownership and operation of its main line, and "that for several years prior to July 23, 1917, respondent [appellant here] main-

tained and operated two lateral spur tracks, known respectively as Industrial Spur Tracks Nos. 1 and 2," giving their lengths, "on which spur tracks respondent has, up to July 23, 1917, supplied cars to shippers at various points along said industrial spur tracks for the shipment of lumber, ties and other commodities in carload lots, other than live stock and perishable freight, and that respondent offered said service, so long as furnished, as aforesaid, to the public generally, on equal terms;" admits that in May, 1916, it filed with the Commission tariffs applying to the spur tracks, and that " these tariffs provide that all carload traffic, except live stock and perishable freight, will be switched between main line stations and loading yards on such spur tracks at a charge of $7.50 per car;" admits that on July 23, 1917, it abandoned all freight service on the spur tracks. The return then avers that the spurs were constructed in 1900 by an incorporated saw-mill company, owning timber near the spurs, and operating saw and planing mills at Leeper, and were constructed to transport that company's timber to appellant's railroad; that the saw-mill company had no ties, switches, track fastenings and bolts in said" spur until it completed its work, and then sold the "rails, ties, switches, track fastenings and bolts in said" spur tracks to appellant; that thereafter appellant agreed with certain owners of timber in the vicinity of the spurs "to place cars for shipment, in carload lots, of freight other than live stock and perishable freight and to move the same when loaded to its railroad for five dollars per car; that thereafter, for the accomodation of all persons who might desire such service, respondent [appellant here] published tariffs showing that while it operated said industrial spur tracks it would extend the contract aforesaid to all persons so desiring such service;" that thereafter the spur tracks, as tonnage failed near their extremities, were in part abandoned and taken up, and they were gradually reduced to their present length; that in 1914

appellant concluded the exhaustion of timber had progressed so far that further operation of the spurs would be abandoned; whereupon certain persons agreed with appellant that if it would repair the spurs for their then length and operate them for two years, these persons would furnish their timber for transportation over the spurs and pay appellant $7.50 per car transported; that appellant accepted the contract "on the condition that the same was approved by relator;" thereafter appellant "filed with relator said contract and prayed the approval of relator thereof; that respondent [appellant] was advised by relator that tariffs in conformity therewith would be filed by relator, when offered . . . if not objected to;" that appellant repaired the spurs at great expense, and filed tariffs as alleged in the application for the writ; that thereafter J. M. Mooney, a party to the contract above mentioned, filed with relator a complaint praying that appellant be required to "operate said industrial spur tracks as a part of its main line" and to be prohibited from collecting charges therefor in excess of those applicable to "any other part of the railroad;" that a hearing on this complaint was had, and the Commission found appellant had expended $5049.30 for repairs of the spurs; that for one year of operation on the spurs appellant had collected (switching charge) $2910; that the spurs contain five and eight per cent grades; that relator refused to pass upon the question whether appellant had a right to abandon the spurs, and found that the relation of common carrier existed between appellant and the public with respect to the spurs, and held that "as long as that relation exists" appellant will be "required to treat the industrial spurs the same as other parts of its line in the application of freight charges upon carload traffic other than live stock and perishable freight, and will be prohibited from charging the switching charges for the movement of freight on said spur; . . . that this order tokk effect upon July 23, 1917, and on that date appellant" elected to abandon the

460     SUPREME COURT OF MISSOURI.

State ex rel. Pub. Serv. Com. v. Mo. South. Ry. Co.

operation of said industrial spur tracks rather than suffer relator to confiscate its property by the order aforesaid; and did abandon and refuse to operate the spurs.

It is then averred that in November, 1915, relator made an order prescribing rates for appellant's railroad and that an appeal from that order is pending; that under the rates in force appellant was not receiving adequate compensation; that the order of July 23, 1917, denying the right to enforce the $7.50 switching charge, further reduced appellant's revenue $2000 per year, "and the commission in that case refused to grant to it higher rates or any other revenue from any other source, and the continued operation of Industrial Tracks 1 and 2 under said order would constitute a confiscation of respondent's property to the extent of $2000 per year; wherefore, it says the Public Service Commission is estopped to complain that it ceased the operation of said trams, and the respondent [appellant] on that account had a right to abandon the operation of said industrial tracks;" that in its answer to Mooney's complaint, appellant pleaded "that any reduction of its revenue, not compensated in some way by an increase elsewhere, would operate as a confiscation of the property" of appellant, in violation of Section one of the Fourteenth Amendment to the Federal Constitution and of Section 30 of Article 22, of the State Constitution, and appellant "now pleads the provision aforesaid" of the Constitutions "in bar of the right of relator to the writ of mandamus prayed for in this action." The return then avers relator's authority to require appellant to operate the spurs is given solely by Section 110 of the Act of 1913, which requires a hearing, and no hearing has been had; that if Section 64 of the same act authorizes this proceeding, which relator denies, still the writ should be denied because the spurs were built without a grant from the State, the operation thereof was voluntary, and appellant had the right to abandon them for good reason or no reason; that appellant

never had charter authority to build or acquire the spurs, ''and that while its action in acquiring and operating said industrial spur tracks may have been and were unlawful and without authority, and the State may compel'' appellant to cease such *ultra vires* operation, it and relator are without authority to compel a continuance of such activities.

The contentions in the brief are that (1) the spurs are neither railroads nor parts of appellant's railroad within the meaning of the law; (2) neither the Public Service Commission nor the courts have power to compel appellant ''to furnish transportation ·not included in the exercise of its franchise;'' (3) ''mandamus is a discretionary writ'' . . . and the granting of this writ in this case was a gross abuse of the discretion of the court; and (4) the judgment rendered confiscates appellant's property and thereby violates both the State and Federal constitutions. .

I. The question whether the spur tracks fall within the regulatory power of the Commission is decided in **Regulation.** Missouri Southern Railroad Company v. Public Service Commission, page 484, a companion case.

II. ''It is settled that a railroad company in possession of its road may be compelled by mandamus to operate its road in accordance with the positive re-requirements of its charter.'' [Elliott on **Mandamus.** Railroads (2 Ed.), sec. 458.] It is also the law that mandamus is the proper remedy to compel a railroad to perform a definite duty to the public. [Northern Pacific R. R. Co. v. Dustin, 142 U. S. 492; Railroad Co. v. Hall, 91 U. S. 343.]

Let it be conceded that under the general law in force prior to the adoption of the Public Service Commission Act in 1913 the facts in this case would not have warranted the writ issued by the trial court, and that under the then law the rule in People v. Railroad,

462     SUPREME COURT OF MISSOURI.

State ex rel. Pub. Serv. Com. v. Mo. South. Ry. Co.

42 Fed. 638, cited by appellant, would have applied. This case presents a different question, i. e. can a railroad since the passage of that act, engaged in operating a spur or branch line, determine for itself the question of its right to abandon such line and act upon such determination, or must it apply to the Public Service Commission for leave? If it must so apply, can it be required to continue operating such line until the Commission has acted and its order has become final?

**Abandonment Without Leave.**

Section 64 of the Act of 1913 (Laws 1913, p. 600) makes it the duty of the Commission, whenever a carrier is doing or about to do anything in violation of law or an order of the Commission, or is omitting or about to omit to do anything required by law or order of the Commission, to direct its counsel to proceed in the courts by injunction or mandamus to correct or prevent the evil. Section 2 (Laws 1913, pp. 557, 558) defines a railroad as every railroad (except street railroads) ''by whatever power operated for public use in the conveyance of persons or property for compensation, with all bridges, ferries, tunnels, equipment, switches, *spurs*, tracks, stations, real estate and terminal facilities of every kind used, *operated,* controlled *or* owned by *or in connection with any* such railroad.'' (Italics ours.) The term ''rate'' is defined as including, among other things, ''switching charge.'' [Laws 1913, p. 560.] The jurisdiction of the Commission extends to all ''railroads'' within the State and ''to the person or corporation owning, leasing, operating or controlling'' them. [Laws 1913, p. 565.] The term service ''is used in its broadest and most inclusive sense and includes . . . the plant, equipment, apparatus, appliances, property and facilities employed . . . in performing any service.'' [Laws 1913, p. 560.] The Commission is expressly vested with ''the powers and duties in this act specified, and also all powers necessary or proper to enable it to carry out fully and effectually all the purposes of this act.'' [Sec. 3, p 561.]

Section 26 provides that Article 2 of the act shall apply to the transportation of passengers and property . . . within this State and to any common carrier performing such service.    Section 27 provides that every carrier transporting persons or freight "shall furnish, with respect thereto, such service and facilities as shall be safe and adequate and in all respects just and reasonable," and prohibits excessive charges therefor. Section 29 requires the carrier to file with the Commission full schedule of all rates and gives the Commission supervisory powers over the form, posting and filing of tariffs.    Section 31 provides that no change shall be made in any "rate, fare or charge, or joint rate, fare, or charge" on file, except upon notice, unless otherwise ordered by the Commission. Under Section 35 no carrier is permitted to transport persons or property until it has filed and published tariffs, nor can it charge any rate other than those filed and published.    Section 43 provides that "the Commission shall have general supervision of all . . . railroads . . . and shall have power to and shall examine the same and keep informed as to their general condition, their capitalization, their franchises and the manner in which their lines and property, owned, leased, controlled or operated are managed, conducted and operated, not only with respect to the adequacy, security and accommodation afforded by their service, but also with respect to their compliance with all the provisions of the law, orders and decisions of the Commission and charter requirements."    Sections 44 and 45 empower the Commission to require annual reports of detailed information concerning the carrier's affairs and to investigate accidents.    Section 46 provides that the Commission may investigate any act or omission of carriers, and shall investigate any act or omission violative of law or an order of the Commission.    These things the Commission may do of its own motion or on the complaint of an aggrieved person.    Section 47 authorizes the Commission to regulate fares and the

"regulations or practices" of carriers and "determine the just, reasonable, safe, adequate and proper regulations, practices, equipment, appliances and services thereafter to be in force, to be observed and to be used in such transportation of persons and property, and so fix and prescribe the same . . . ; and thereafter it shall be the duty of" the carrier to observe these .orders. The Commission is empowered to require carriers to form a continuous line where feasible and establish joint rates and fares, and to operate through cars over connected lines. Section 48 provides that any new rate or practice affecting rates may be stayed by the Commission. Under Section 49 the Commission may order repairs, improvements, changes and additions. Further (Sec. 51) the Commission may require additional trains or equipment. Railroads (Sec. 53) cannot be constructed or extended without a certificate from the Commission. Supervision over the issuance and sale of stocks and sale or transfer of franchises and reorganization is given the Commission. All the powers of the Commission (Sec. 106) are enforcible in the courts by proper action brought by the counsel of the Commission.

In State ex rel. v. Postal Telegraph Co., 96 Kan. 298, the Supreme Court of Kansas had before it a case involving the principle determinative of this case. That was a proceeding by mandamus to compel respondent to re-establish its telegraph office at Syracuse, abandoned because it proved unprofitable. Under a Public Utilities Commission Act substantially like our act so far as concerns relevant provisions, the Kansas Supreme Court held the company could not abandon the Syracuse office without applying to the Public Unitilities Commission for authority to do so.

In this State, as in that, the act provides a complete system for the regulation and control of public service corporations. [State ex inf. v. Gas Co., 254 Mo. l. c. 534.] The act adds to the powers expressly given to the Commission all others necessary to the full and

effectual exercise of those powers. All rates, fares, facilities, service and equipment and changes therein fall within the authority of the Commission. Adequate service and facilities are expressly required to be furnished. Questions relative to these things are to be determined by the Commission. Appellant was operating spur tracks which are included in terms in the act. Can appellant abandon this service without applying to the Commission for leave to do so? If so, any carrier can abandon any service without such leave, and, doubtless, change fares and take off equipment, whenever it comes to the conclusion that the facts justify such action. If this course be lawful, the Commission will become little more than a figurehead so far as carriers are concerned, and its powers can be ignored or invoked as the carrier may desire. In this case the carrier was operating in submission to the Commission and under rates on file. A rate was changed. Instead of applying to the Commission for an increase elsewhere or for leave to abandon the service, the carrier said, in effect, that it would not submit to the change, but would take up the track. It may be it is entitled to an order permitting it to do so. It should have applied to the Commission for the leave. Unless the power of the Commission to pass on this question is conceded, then it is apparent the exercise of some of its express powers is conditioned upon the consent of the carrier. The express power of the Commission over facilities, equipment and construction and changes therein and over the operation of trains (Secs. 49, 51, Laws 1913, pp. 588, 590) is of no avail if appellant's contention is sound. As was said by the Kansas Supreme Court: "If these utility corporations may abandon this particular service without the consent of the Commission, may they not take off their passenger trains, take up and abandon unprofitable branch lines, change the fares and rates of transportation for passengers and freight, or raise the charge for telegraph messages without the

30—279 Mo.

consent of the Commission? These questions answer themselves. To yield approval to the contention of defendants is to concede that the State's program for the regulation and control of public service corporations is ineffective; that the public utilities act has been enacted in vain." [State ex rel. v. Postal Tel. Co., supra.] The case is in point on facts and law, and we think the conclusion drawn is sound. Appellant should have taken before the Commission the question of its right to abadon the spur. If the finding of the Commission was unfavorable, a review thereof could have been had in the courts in the usual way.

III. There is no valid constitutional objection to the judgment. The general scheme of rates and compensation was not involved. That an order of a Com-
Confiscation. mission or a court concerning a particular facility may result in some financial loss does not necessarily bring it into conflict with the Constitution. [Atlantic Coast Line v. Commission, 206 U. S. 1.] Further, this question is not in this case. It might better be presented in a proper proceeding for leave to abandon the spurs.

Other questions raised are decided in Missouri Southern Railroad v. Pub. Serv. Commission, page 484, a companion case. The judgment is affirmed. *Graves, J.*, concurs; *Bond, J.*, concurs in the result; *Woodson, J.*, absent.