

# OFFICE OF
# THE ATTORNEY GENERAL
## AUSTIN, TEXAS

PRICE DANIEL
ATTORNEY GENERAL

July 23, 1947

Hon. Ernest O. Thompson
Chairman
Railroad Commission of
   Texas
Austin, Texas

Opinion No. V-309

Re: The necessity of
    approval by the
    Railroad Commis-
    sion of Texas of
    a discontinuance
    of the supply of
    gas to a munici-
    pality by a gas
    utility, pursuant
    to contract be-
    tween the parties.
    And related ques-
    tions.

Dear Sir:

You have requested the opinion of this Depart-
ment in letters establishing this factual situation:

"In May, 1928, the Mobeetie Gas Company
made a contract with certain individuals to
furnish gas to the city limits of Miami,
Roberts County, Texas; these individuals
having a franchise from the City running
for a period of 20 years; the Mobeetie Gas
Company to construct a 4 inch line and fur-
nishing gas to the city limits of the City
of Miami. This contract was also for a
period of 20 years. This contract will ex-
pire in 1948.

"The Public Service Corporation of Tex-
as is successor to the Mobeetie Gas Com-
pany, and desires to discontinue furnish-
ing gas to the city limits of the City of
Miami at the expiration of its contract for
the reason, among others, that it will re-
quire the construction of a new 15 mile
line since the old line is not in condition
to continue service after the expiration
date.

". . . Public Service Corporation has in
mind that it will give notice to the owners
of the franchise in the City of Miami and to
the said City in ample time for them to make
other arrangements before the expiration of
the contract."

Your questions are as follows:

"Please advise if it is necessary for
the Public Service Corporation of Texas to
apply for permission from the Railroad Com-
mission to discontinue the service described
in the enclosed letters and if it is neces-
sary for a hearing to be held if such appli-
cation is to be required.

"Also please advise us if notice to the
customers of the utility are required to be
given notice prior to discontinuance of
service in the event application to the
Commission is not required."

The Public Service Corporation is a "gas util-
ity" or "public utility" as defined in Article 6050,
V.C.S., as follows:

"The term 'gas utility' and 'public util-
ity' or 'utility,' as used in this subdivi-
sion, means and includes persons, companies
and private corporations, their lessees,
trustees, and receivers, owning, managing,
operating, leasing or controlling within
this State any wells, pipe lines, plant,
property, equipment, facility, franchise,
license, or permit for either one or more
of the following kinds of business:

"1.   Producing or obtaining, transport-
ing, conveying, distributing or delivering
natural gas:   (a) for public use or service
for compensation; (b) for sale to munici-
palities or persons or companies, in those
cases referred to in paragraph 3 hereof,
engaged in distributing or selling natural
gas to the public; (c) for sale or delivery
of natural gas to any person or firm or cor-
portation operating under franchise or a con-
tract with any municipality or other legal

subdivision of this State; or, (d) for sale
or delivery of natural gas to the public for
domestic or other use.

"2. Owning or operating or managing a
pipe line for the transportation or car-
riage of natural gas, whether for public
hire or not, if any part of the right of
way for said line has been acquired, or may
hereafter be acquired by the exercise of
the right of eminent domain; or if said line
or any part thereof is laid upon, over or
under any public road or highway of this
State, or street or alley of any munici-
pality, or the right of way of any rail-
road or other public utility; including also
any natural gas utility authorized by law
to exercise the right of eminent domain.

"3. Producing or purchasing natural gas
and transporting or causing the same to be
transported by pipe lines to or near the
limits of any municipality in which said gas
is received and distributed or sold to the
public by another public utility or by said
municipality, in all cases where such busi-
ness is in fact that only or practically ex-
clusive agency of supply of natural gas to
such utility or municipality, is hereby de-
clared to be virtual monopoly and a business
and calling affected with a public interest,
and the said business and property employed
therein within this State shall be subject
to the provisions of this law and to the ju-
risdiction and regulation of the Commission
as a gas utility.

"Every such gas utility is hereby de-
clared to be affected with a public interest
and subject to the jurisdiction, control and
regulation of the Commission as provided
herein."

"Jurisdiction, control and regulation" of the
utility are vested in the Railroad Commission by Arti-
cle 6050, supra. This "jurisdiction" and "control" may
not be divested without the consent of the Railroad Com-
mission. For only the Railroad Commission may terminate
that "jurisdiction" and control."

Section 1 of Article 6053, V.C.S., provides as follows:

"The Commission after due notice shall fix and establish and enforce the adequate and reasonable price of gas and fair and reasonable rates of charges and regulations for transporting, producing, distributing, buying, selling, and delivering gas by such pipe lines in this State; and shall establish fair and equitable rules and regulations for the full control and supervision of said gas pipe lines and all their holdings pertaining to the gas business in all their relations to the public, as the Commission may from time to time deem proper; and establish a fair and equitable division of the proceeds of the sale of gas between the companies transporting or producing the gas and the companies distributing or selling it; and prescribe and enforce rules and regulations for the government and control of such pipe lines in respect to their gas pipe lines and producing, receiving, transporting, and distributing facilities; and regulate and apportion the supply of gas between towns, cities, and corporations, and when the supply of gas controlled by any gas pipe line shall be inadequate, the Commission shall prescribe fair and reasonable rules and regulations requiring such gas pipe lines to augment their supply of gas, when in the judgment of the Commission it is practicable to do so; and it shall exercise its power, whether upon its own motion or upon petition by any person, corporation, municipal corporation, county, or Commissioners precinct showing a substantial interest in the subject, or upon petition of the Attorney General, or of any County or District Attorney in any county wherein such business or any part thereof may be carried on."

By virtue of Article 6053, supra, the Commission is empowered with "full control and supervision of said gas pipe lines and all their holdings pertaining to the gas business in all their relations to the public." It is further empowered with the "government and

<u>control</u> of such pipe lines in respect to their gas pipe
lines and producing, receiving, transporting and dis-
tributing facilities" and empowered to "<u>regulate</u> and ap-
portion the supply of gas controlled by any gas pipe
line." It may exercise its power upon "its own motion
or upon petition."

It would be an empty "jurisdiction" and an emp-
ty "full control" if the Commission could not continue
a service by a utility. Otherwise the utility could
abandon at will and bargain on that basis. It is stated
in <u>State ex rel. Public Service Commission v. Missouri</u>
<u>Southern R. Co.</u> (Sup. Ct. Mo. 1919), 214 S. W. 381: (pp.
384-385)

> ". . . Can appellant abandon this serv-
> ice without applying to the commission for
> leave to do so? If so, any carrier can aban-
> don any service without such leave, and,
> doubtless, change fares and take off equip-
> ment, whenever it comes to the conclusion
> that the facts justify such action. If this
> course be lawful, the commission will become
> little more than a figurehead so far as car-
> riers are concerned, and its powers can be
> ignored or invoked as the carrier may desire.
> In this case the carrier was operating in
> submission to the commission and under rates
> on file. A rate was changed. Instead of
> applying to the commission for an increase
> elsewhere, or for leave to abandon the serv-
> ice, the carrier said, in effect, that it
> would not submit to the change, but would
> take up the track. It may be it is entitled
> to an order permitting it to do so. It
> should have applied to the commission for
> the leave. Unless the power of the commis-
> sion to pass on this question is conceded,
> then it is apparent the exercise of some of
> its express powers is conditioned upon the
> consent of the carrier. The express power
> of the commission over facilities, equipment,
> and construction, and changes therein, and
> over the operation of trains (sections 49,
> 41, Laws 1913), pp. 588, 590), is of no avail,
> if appellant's contention is sound. As was
> said by the Kansas Supreme Court:

> "'If these utility corporations may aban-
> don this particular service without the con-
> sent of the commission, may they not take

off their passenger trains, take up and aban-
don unprofitable branch lines, change the
fares and rates of transportation for pas-
sengers and freight, or raise the charge for
telegraph messages without the consent of
the commission?  These questions answer them-
selves.  To yield approval to the contention
of defendants is to concede that the state's
program for the regulation and control of
public service corporations is ineffective;
that the Public Utilities Act has been enact-
ed in vain.'  State ex rel. v. Postal Tel.
Co., supra."

It is further stated in State v. Kansas Postal-
Telegraph-Cable Co. (Sup. Ct. Kans. 1915), 150 P. 544:
(p. 547)

". . . In view of all these, can there
be any doubt of the duty of the defendant,
before dismantling its station at Syracuse
and abandoning its business thereat, to se-
cure the approval of the Commission for such
an important change in its mode of service?
How is the Public Utilities Commission to
discharge its important duties if the pub-
lic service companies may quit business here,
there, or anywhere in the state without an
opportunity for the Commission to determine
the propriety of such a course?

"It is clear that, if the defendant may
forego its business in Syracuse without the
sanction of the Commission, it can close its
office in Topeka, Wichita, or Kansas City,
without the consent of the Commission.  If
this public utility, a telegraph company, can
close one of its offices and quit business
without the consent of the Commission, any
other public utility, like the Santa Fe Rail-
way, for example, could close its depot at
Dodge City, Hutchinson, or Emporia without
the consent of the Commission.  Where would
this end?  If these utility corporations may
abandon this particular service without the
consent of the Commission, may they not take
off their passenger trains, take up and aban-
don unprofitable branch lines, change the
fares and rates of transportation for pas-
sengers and freight, or raise the charge for

**51**

telegraph messages without the consent of the Commission? These questions answer themselves. To yield approval to the contention of the defendant is to concede that the state's program for the regulation and control of public service corporations is ineffective; that the public utilities act has been enacted in vain."

Further reason dictates that this jurisdiction may not be terminated without the consent of the Railroad Commission. For, if the converse be true, a utility, against the will of the State, could abandon its pipe line, tear up the line and sell it before replacement could be made. The possible effects of such a claimed power could be utter disaster to the great interests of the community. Destruction of private property, in which the entire community is interested, could result. The life of the citizen as well as the property could be jeopardized.

It is well established that "as a general rule, the proprietor of a public utility or service is bound to continue the business until such time as he shall have been granted permission to discontinue it."  34 Tex. Jur., "Public Utilities and Services," Section 15, p. 717; 43 Am. Jur., "Public Utilities and Services," Section 78, p. 621; 5 Corpus Juris, "Public Utilities," Section 17, p. 8.  See 5 P. U. R. Digest, "Service," Section 215, pp. 4611-4614.

Moreover, this has been the practice and construction of the Railroad Commission over a period of years. During this period of years, utilities have made application to the Railroad Commission for permission to discontinue their service. The construction and interpretation of a statute by the Department charged with its administration is entitled to great weight and will be adhered to unless clearly erroneous or unsound.  39 Tex. Jur., "Statutes," Section 126, pp. 235-237.

In answer to your first question, therefore, the Public Service Corporation must have the consent of the Railroad Commission to discontinue the furnishing of gas to the distributor for the City of Miami.

Section 1 of Article 6053, supra, provides, in part, as follows:

"The Commission after due notice shall fix and establish . . ."

Section 14 of Article 6053, V.C.S., provides as follows:

"Notice of any hearing, and of the time and place thereof, shall be given by registered mail not less than ten (10) days exclusive of the day of mailing before such hearing, addressed to all parties whom the Commission may deem to be interested in the subject matter of such hearing. Any licensee against whom a complaint has been filed shall be notified of the hearing on such complaint as herein provided, and shall have the right to appear at such hearing, file answer, introduce evidence, and be heard both in person and by counsel."

In answer to your second question, it is our opinion that the statutes contemplate a hearing by the Railroad Commission upon application for discontinuance of service, because the Commission must enter an order upon such application under Article 6053, supra, which must be after "due notice." Section 14, supra, provides that "notice of any hearing" shall be given to "interested" parties, not less than 10 days "before such hearing."

In view of this opinion, your third question does not require an answer.

## SUMMARY

1. It is necessary for the Public Service Corporation, a "gas utility" as defined by our statutes (Article 6050, V.C.S.), to have the consent of the Railroad Commission to discontinue the furnishing of gas to the distributor for the City of Miami. State ex rel. Public Service Commission v. Missouri Southern R. Co. (Sup. Ct. Mo. 1919), 214 S. W. 381, 384; State v. Kansas Postal-Telegraph-Cable Co. (Sup. Ct. Kans. 1915), 150 P. 544, 547.

2. A hearing must be held by the Commission on an application of a "gas utility" for requested permission to discontinue

service to a municipality.  Article 6053,
V.C.S.

Yours very truly

ATTORNEY GENERAL OF TEXAS

By      *Elton M. Hyder, Jr.*
        Elton M. Hyder, Jr.
                Assistant

EMH:jt

APPROVED:

*Price Daniel*
ATTORNEY GENERAL