**RAILROAD COMMISSION OF TEXAS
et al., Petitioners,**

v.

**CITY OF AUSTIN et al., Respondents.**

No. B–4843.

Supreme Court of Texas.

March 5, 1975.

Dissenting Opinion On Denial of Rehearing May 28, 1975.

John L. Hill, Atty. Gen., Rex White, Jr., Asst. Atty. Gen., Austin, Burford, Ryburn & Ford, Frank M. Ryburn, Jr., Erle Nye, Dallas, Cantey, Hanger, Gooch, Cravens & Munn, Cecil E. Munn, Fort Worth, Clark, Thomas, Harris, Denius & Winters, Barr McClellan, Austin, Ira Butler, Fort Worth, Worsham, Forsythe & Sampels, Jos. Irion Worsham, Dallas, Bullock & Scott, Tom R. Scott, Midland, Clyde A. Mote, Houston, Graves, Dougherty, Hearon, Moody & Garwood, Dan Moody, Jr., Austin, Brace-well & Patterson, William Key Wilde and Charles G. King, III, Liddell, Sapp, Zivley & Brown, W. Robert Brown, Houston, Keys, Russell, Watson & Seaman, William H. Keys, Corpus Christi, Butler, Binion, Rice, Cook & Knapp, Frank J. Knapp, Louis B. Paine, Jr., and Thomas W. Houghton, Houston, Head & Kendrick, Hayden W. Head, Jr., Corpus Christi, for petitioners.

Don R. Butler, City Atty., George K. El-brecht, Asst City Atty., Austin, Matthews, Nowlin, Macfarlane & Barrett, W. L. Matthews, Jon C. Wood and Dick Terrell Brown, San Antonio, Small, Craig & Werk-enthin, C. C. Small, Jr., and Lawrence S. Smith, Austin, for respondents.

GREENHILL, Chief Justice.

This case concerns the powers of the Texas Railroad Commission to regulate gas utilities and how it may exercise its powers. The primary source of its jurisdiction for such purposes comes from a statute enacted in 1920 which is known as the Cox Act.[1]  In order to ascertain legislative in-

---

1. Acts 36th Legislature, 3rd Called Session 1920, Chapter 14, page 18 et seq.  Most of the sections of the Act were codified in the 1925 revision and became Article 6050 et seq.  Other portions prohibiting discrimination and providing criminal penalties were carried forward in the 1925 Revised Criminal Statutes as Articles 1630 and 1631.  When the new Texas Penal Code was enacted, these provisions were returned to the civil statutes as Articles 6057a and 6057b.  Acts 63rd Legislature, R.S. (1973) page 996f. Unless otherwise indicated, statutory references herein are to Vernon's Texas Civil Statutes Annotated.  Emphasis throughout is added by the Court.

tent, and to put the provisions of the statute in context, the Cox Act will be discussed herein, along with the construction it has heretofore received by this Court. It will be noted at the outset that there was, and is, no statutory provision which prohibited the sale of gas reserves, or rights in gas reserves; and there is no self-enacting provision requiring the prior approval by the Commission of the sale or assignment of gas reserves or rights therein.[2] And at the time of the transactions here in question, the Railroad Commission had promulgated no rule requiring its prior approval of the sale of gas reserves by a gas utility.

Broadly speaking, the Cities of Austin and San Antonio, and the Lower Colorado River Authority (LCRA), in Docket Number 510 of the Commission, called upon the Commission to suspend indefinitely the delivery of gas which flowed in pipelines owned or associated with Lo-Vaca Gathering Company, herein called Lo-Vaca, and to reallocate the supply of gas which had been sold or assigned under contracts executed by Lo-Vaca or its parent company, Coastal States Gas Producing Company, before the Commission had made any rules or regulations relative thereto. As will be discussed, the Commission dismissed the application of the City of Austin et al without prejudice. It stated that it had no jurisdiction to determine the title to the gas, and it announced on the same day its Docket Number 520. In Docket 520, the Commission announced that it considered it its duty to apportion gas among cities, towns and corporations on a statewide basis. It thereupon called a statewide hearing to determine if the available gas supply in Texas could be apportioned on a voluntary basis; and if not whether there was a need for a mandatory statewide apportionment program.

Thereupon, Austin, San Antonio and the LCRA filed suit in a district court of Travis County against the Commission. The Commission's position, set out below, is amplified by the allegations of the intervenors which came into the case in support of the Commission's position. Among the intervenors are the Texas Utilities Fuel Co., called herein TUFCO, Dallas Power & Light Co., Texas Electric Service Co., and the Texas Power & Light Co. TUFCO and its affiliates serve some 323 municipalities and some 4 million people of Texas with gas or electrical energy produced by gas. Many cities served by TUFCO have submitted briefs in this Court resisting the power of the Commission to allocate, or take away, gas which they say would affect their energy supplies. These include Dallas, Fort Worth, Bonham, Denison, Hillsboro, Tyler, Lufkin, Nacogdoches, Corsicana, Midland, Odessa, Sweetwater, Brownwood, Waco, Temple, and Taylor.

Also intervening were several industrial users including American Smelting, DuPont, Dow Chemical, Clajon Inc., El Paso Natural Gas, Southwestern Refining, and Amoco Gas Company, all of whom put into evidence contracts with Lo-Vaca entered into between 1969 and 1972, which they contended that the Commission had no power to set aside.

The Railroad Commission was of the view that the Commission was without power or jurisdiction to determine the title to the gas under contracts between Lo-Vaca and TUFCO, and between Lo-Vaca and the industrial users. They also took the position that the Cox Act did not authorize the Commission to take such action,

---

2. By way of contrast, the Congress has provided with regard to the Federal Commission that, "No natural gas company shall abandon all or any portion of its facilities . . . without the permission and approval of the Commission first had and obtained . . . ." 15 U.S.C. § 717f(b). A similar provision is contained in the Texas Common Purchaser Act: "No common carriers by pipe lines . . . shall hereafter abandon any of its connections or lines except under authority of a permit granted by the Railroad Commission . . . ." Sec. 6a of Article 6049a.

or to promulgate retroactive rules which would set aside contracts under which gas reserves, or rights to gas, were sold, and to suspend indefinitely the delivery of gas under those contracts. The Commission *did* assert the power under the Cox Act to regulate·and apportion "Lo-Vaca's" gas. It had already undertaken to do so.

On June 21, 1973, after a public hearing, the Commission entered an order establishing curtailment priorities and directed that "neither Lo-Vaca nor Coastal States nor subsidiaries nor affiliates shall make any new sales or spot sales during the period of this Order." In July of 1973, the Commission, relying upon Article 6063, filed suit against Lo-Vaca in the District Court of Travis County, Texas, 200th Judicial District, asking for appointment of a receiver for Lo-Vaca. No receivership was granted, but pursuant to an Agreed Judgment entered July 17, 1973, the Judge of the 200th Judicial District selected and maintains an independent Board of Directors for Lo-Vaca which operates that company in accordance with the "plan" set out in the Agreed Judgment.

The Commission and the Petitioners also pointed to the pendency of a suit in the district court in Harris County (Houston) attacking in court the legality of the same contracts which Austin, San Antonio and the LCRA desired to be "reviewed" by the Commission. The Harris County suit is *Pennzoil Pipe Line Co. v. Coastal States.* Pennzoil there contends that the Lo-Vaca contracts were void or voidable because they were illegal (discriminatory) and should be set aside. Thereupon, it is alleged, the gas would then be Lo-Vaca's; and the Commission would have power under the Cox Act to allocate and apportion such gas among Lo-Vaca's customers. Pennzoil also contends that in equity, TUFCO and the other parties should be treated as "customers" of Lo-Vaca, and that the court should declare the rights of the parties in a

declaratory judgment. The Commission, in its Docket Number 510, was of the view that the *court* (as contrasted with the Commission) could and would determine title to the gas and the rights under the gas contracts between TUFCO and others.

The district court in Travis County in this case disagreed. It held that the Commission had the power, jurisdiction, and duty under the Cox Act to go behind the contracts with TUFCO and others. The court also held that by necessary implication the Commission had the power and duty to allocate, or reallocate, the supply of gas flowing in any pipeline of Lo-Vaca regardless of who owns the gas, notwithstanding the fact that Austin, San Antonio and the LCRA concede that the Commission has no power to determine the title to the gas. The Court of Civil Appeals affirmed. 512 S.W.2d 345. Our judgment is that for the reasons set out below the Commission did not err in dismissing without prejudice its Docket 510.

The Court recognizes the importance of the case. For that reason, we have reviewed the status of the Commission itself and some of the powers and duties which it has,—and which it does not have. And, in order to arrive at what we regard as the powers granted to the Commission by the Legislature, we review below the Legislature's entry into the field of gas utility regulation. As stated, the principal legislative action most relevant here is the Cox Act. In an attempt to arrive at a correct understanding of the powers which were, and which were not, granted by the Legislature to the Commission in the Cox Act, it is considered appropriate to review the history of the statutes, as well as the particular words used, the generative forces which led to the enactment of the statute, events surrounding its enactment, the problems they were designed to remedy, and the construction given by this Court to the legislative acts.[3] The Legislature has met

3. 2A Sutherland, Statutory Construction, 4th ed. 1973, 181 and 191; Cousins v. Sovereign Camp, W.O.W., 120 Tex. 107, 35 S.W.2d
696 (1931); Evans v. American Pub. Co., 118 Tex. 433, 13 S.W.2d 358 (1929).

many times since the cases set out below were decided. Whether it acquiesced in the decisions or not is not for us to say; but the statutes have not been substantially changed to evidence a different legislative intent. It is now in session; and, within constitutional limitations, it may amend its acts, or enact new statutes, to deal with matters of public policy in the regulation of natural gas and the powers of the Commission.

## THE COMMISSION

In the early days of this State, the Legislature itself attempted to regulate railroad companies and their rates. Its efforts were not successful. Attorney General James S. Hogg, later Governor, undertook the leadership to bring effective regulations to that industry. A constitutional amendment was adopted in 1890 which, in effect, called upon the Legislature to pass laws "to correct abuses and prevent unjust discrimination and extortion" in rates. To accomplish these purposes, the Legislature was authorized in Article X, Section 2, Vernon's Ann.St., to "provide and establish all requisite means *and agencies*" as may be necessary. That Section authorized the Legislature to invest "such agencies" [the Commission] "with such powers as may be deemed adequate and advisable."

Another constitutional amendment adopted in 1894 dealing with terms of office, provides in part that *"when* a Railroad Commission is created by law [i. e., by the Legislature] it shall be composed of three Commissioners who shall be elected . . . ." Article XVI, Section 30.

The Legislature did create such an agency,—the Railroad Commission. At an early date, it was contended that since the Commission was constitutionally conceived to regulate *railroads,* it could not be delegated the power to regulate gas utilities; and hence the whole Cox Act, regulating gas utilities and not railroads, was an unconstitutional delegation of power. This Court disagreed. City of Denison v. Municipal Gas Co., 117 Tex. 291, 3 S.W.2d 794 (1928). This Court held that since the Constitution said the Legislature could grant such agency [the Commission] such powers as may be deemed adequate and advisable, the Legislature could grant the Commission power and authority to regulate gas utilities.

The other side of that coin, however, is that the Commission's power is not derived from the Constitution. It comes from legislative grants of powers and jurisdiction. This Court has generally held that the Commission has only such powers as are *specifically* delegated to the Commission. Humble Oil & Refining Co. v. Railroad Commission, 133 Tex. 330, 128 S.W.2d 9 (1939).

In 1961, the city fathers of San Antonio determined to purchase the city's gas from Alamo Gas Supply Company and not to renew the contract with United Gas. Such a contract was entered into by San Antonio even though it was asserted that Alamo had no gas reserves or pipelines. Alamo assigned the contract to Coastal States which connected San Antonio to Lo-Vaca pipeline facilities. Suit was brought by United to require the Commission to determine whether the new contract between San Antonio and its new gas suppliers was in the public interest. It was argued that all contracts with gas pipe line utilities were entered into in the light of the statutes, including the Cox Act. The Commission took the position that it had no jurisdiction to set aside the contract. Its position was upheld. The Commission did not have jurisdiction to void contracts. Railroad Commission v. United Gas Pipe Line Co., 358 S.W.2d 907 (Tex.Civ.App.1962, writ ref'd n. r. e.). It had no such specifically delegated authority. See also Gregg v. Delhi-Taylor Oil Co., 162 Tex. 26, 344 S.W.2d 411 (1961).

This Court has also held on several occasions that the Commission does not

have power to determine title to land or property rights. It is invested with broad powers to determine where, or whether, wells may be drilled, and how much oil or gas may be produced. But it does not have authority to determine the ownership of oil or gas, or how the proceeds from the sale of oil or gas should be apportioned among people who contend that it was, or is, actually being produced from beneath their land. Previous opinions of this Court have stated it this way: the Commission "has not been given the power to determine property rights as between litigants." Ryan Consolidated Petroleum Co. v. Pickens, 155 Tex. 221, 285 S.W.2d 201, 207 (1955); Magnolia Petroleum Co. v. Railroad Commission, 141 Tex. 96, 170 S. W.2d 189 (1943). "The Railroad Commission has no power to determine property rights." Jones v. Killingsworth, 403 S.W. 2d 325, 328 (Tex.1966). "Rules and regulations of the Railroad Commission cannot effect a change or transfer of property rights." Nale v. Carroll, 155 Tex. 555, 289 S.W.2d 743, 745 (1956).

## BACKGROUND OF THE COX ACT

It is apparent that the intent, purpose and language of the Cox Act is crucial to a decision here. The opinion of the Court of Civil Appeals in this case is based entirely upon it.

In some respects, it is unfortunate that Texas has no official Legislative record similar to the Congressional Record. Our research, however, including information

contained in court decisions,[4] reports of the Railroad Commission, and information in the Texas State Library and in the library of The University of Texas, does show the context in which the Cox Act was passed in 1920.

Before the Cox Act, there was no public agency with powers of a commission to regulate gas utilities. An Act passed in 1905, dealing particularly with cities and towns, declared that "all extortionate and unreasonable rates charged by public utility corporations [specifically including gas companies] . . . are hereby declared unlawful, and *the district courts* of this State are hereby vested with jurisdiction and full power and authority to regulate, prevent and abolish the same . . . ."[5] The Act is still on the books and is carried forward as our present Article 1125.

In 1911, an act was passed authorizing the formation of corporations to generate, transport, and sell gas and electricity. Acts 32nd Leg., Ch. 111, page 228. Section 6 of that Act provided that "It shall be *unlawful* for any corporation organized under this Act to discriminate against any person . . . or place in the charge for such gas . . . *or in the service rendered* under similar and like circumstances." This Act is also still on the books today; and the portion dealing with discrimination is Article 1438. Many suits have been instituted directly in court under that Act for discriminations by gas utilities as to rates charged and "services rendered." The type of "service rendered" affects the rate which may be charged.[6]

4. For example, Municipal Gas Company v. Lone Star Gas Co., 259 S.W. 684 (Tex.Civ. App.1924); Lone Star Gas Co. v. Municipal Gas Co., 117 Tex. 331, 3 S.W.2d 790 (1928); State v. Lone Star Gas Co., 86 S.W.2d 484 (Tex.Civ.App.1935, writ ref. 1938), (reversed as to rates fixed by the Commission on gas moving in interstate commerce, Lone Star Gas Co. v. Texas, 304 U.S. 224, 58 S.Ct. 883, 82 L.Ed.2d 1304). The opinion of the Court of Civil Appeals sets out that Lone Star owned more than 99% of the stock of Municipal Gas Co. and other corporations

through which Lone Star distributed gas to cities. 86 S.W.2d at 490.

5. Acts 29th Legislature (1905), Chapter 145, page 348. This Act was carried into the 1911 Revised Statutes as Article 1025, and into the 1925 Revision as Article 1125.

6. United Gas Corp. v. Shepherd Laundries Co., 144 Tex. 164, 189 S.W.2d 485 (1945); Texas Power & Light Co. v. Doering Hotel Co., 139 Tex. 351, 162 S.W.2d 938 (1942); Ford v. Rio Grande Valley Gas Co., 141 Tex. 525, 174 S.W.2d 479 (1943); Leslie v.

## THE SITUATION IN 1920

In 1920, Texas was not a major producer of natural gas.[7] The Panhandle field had been discovered, but it was developed at that stage mainly for its oil productivity.

The gas field in Clay County, east of Wichita Falls, and one in Palo Pinto County were the fields which served North Texas. The development of the pipe line business, as related to the Cox Act, is reflected in the 1924 opinion of the Court of Civil Appeals in Municipal Gas Co. v. Lone Star Gas Co., 259 S.W. 684 at 686, and a later opinion in State v. Lone Star Gas Co., 86 S.W.2d 484. The Municipal Gas petition filed in 1921, just after the passage of the Cox Act, indicates that Lone Star was the owner of the gas producing properties in Clay and Palo Pinto Counties;[8] that Lone Star was building [enlarging] its pipe lines in order to market its gas to many towns in North Texas. That opinion recites that Lone Star bound itself by contract with its distributor corporation "to complete the construction of its pipe line . . . so delivery could be made . . . just outside the limits of the towns and cities to be served . . . ."

It therefore appears that one gas company and its affiliates and its pipe line facilities was the main supplier, if not the only supplier, from the then available gas fields to the cities of North Texas. This condition is reflected in the words of Section 1(3) of the Act: ". . . in all cases where such business is in fact the only or practically exclusive agency of supply of natural gas to such utility or municipality . . . ."

But cities and towns had considerable difficulty in dealing with Lone Star. Apparently that corporation, and its subsidiary corporations, not then regulated, felt free to enter into contracts with cities and towns at the most advantageous price it or they could get, or to not enter into agreements with them at all. The City of Dallas felt particularly aggrieved. It had entered into a contract with Lone Star and its affiliates for gas, but it was unable to obtain a satisfactory renewal agreement because of the price asked. In the hearing before the Senate Committee considering the Cox Act, Mr. Collins [Dallas' City Attorney] stressed the attitude of the pipe-line companies, which he said had contracted to supply Dallas for five years, and then gone into other fields where profits were larger, leaving Dallas without gas. Mayor Wozencraft of Dallas "outlined the fight made in the city of Dallas to secure better gas service, and told of the suffering of the people in North Texas last winter, due to gas shortage."[9]

---

Houston Natural Gas Co., 280 S.W.2d 353 (Tex.Civ.App., writ ref. n. r. e. 1955); Texas Gas Utilities Co. v. City of Uvalde, 77 S.W.2d 750 (Tex.Civ.App.1934, no writ).

In 1907, a statute authorizing cities to regulate and fix gas rates and prohibiting the mayor or city council from receiving free service or service at a lower rate was enacted. Acts 30th Leg., Ch. 117, page 217. This Act is still on our statute books with modifications not relevant here as Art. 1119.

7. In 1919, when the Cox Act was first introduced, Texas produced 24,710 million cubic feet of gas. In 1920, it produced only 37,063 million cubic feet. *Mineral Resources of the United States*, Part II, U.S. Dept. of Commerce, Bureau of Mines, House Document 358, part 2, 72nd Congress, First Session. Production in Texas, while still not adequate for the State's needs, had risen in 1971 to 9,518,644 million cubic feet. Report of the Subcommittee on Science & Astronautics, House of Representatives, 93rd Congress, First Session, Government Docket 99–7220, page 235. While not an official document, the Texas Almanac sets out the production per year. See 1972–73 Texas Almanac, page 399.

8. The same statement of these facts appears in the opinion of this Court in Lone Star Gas Co. v. Municipal Gas Co., 117 Tex. 331, 3 S.W.2d 790 (1928).

9. Dallas News of June 2 and June 20, 1920. These and other related accounts are available at the Texas State Library, U.S. and Texas Documents Division, Room 301, in Austin, and in the Eugene C. Barker Tex-

Governor W. P. Hobby was aware of the urgency of legislation. He sent a message on May 27, 1920, to the third called session of the Legislature. His message submitted the rather comprehensive title to the bill which became the Cox Act.[10] The bill was introduced that same day.[11]

The Cox Act as passed is set out in pertinent part below. As indicated, portions of the Act dealing with penalties for discrimination were broken out of the civil statutes and carried in the criminal laws for many years.

## THE COX ACT

To arrive at legislative intent, it is necessary to look at the pertinent provisions of the entire Cox Act. The Act was broken up and codified in the official Revised Civil Statutes and the Revised Criminal Statutes of 1925. Accordingly, the Cox Act Section numbers and the Sections of the 1925 Revision will be shown.

The Act, now Article 6050, begins with a broad definition of those subject to regulation thereunder:

"The term 'gas utility' and 'public utility' or 'utility,' * * * includes persons, companies and private corporations, their

lessees, trustees, and receivers, owning, managing, operating, leasing or controlling within this State any wells, pipe lines, plant, property, equipment, facility, franchise, license, or permit for either one or more of the following kinds of business:

"1. Producing or obtaining, transporting, conveying, distributing or delivering natural gas: (a) *for public use or service for compensation*; (b) *for sale to municipalities* or persons or companies, in those cases referred to in paragraph 3 hereof, engaged in distributing or selling natural gas to the public; (c) for sale or delivery of natural gas to any person or firm or corporation *operating under franchise or a contract with any municipality* or other legal subdivision of this State; or, (d) *for sale or delivery of natural gas to the public for domestic or other use.*

. . . . . .

"3. Producing or purchasing natural gas and transporting or causing the same to be transported by pipe lines *to or near the limits of any municipality* in which said gas is received and distributed or sold *to the public by another public utility or by said municipality,* in all cases where such business is in fact the only

as History Center, Sid Richardson Hall, Unit 2, The University of Texas, Austin. See also a related account in the Dallas News of May 28, 1920, page 10. The Cox Act was approved on June 12, 1920. The following day, the Dallas News carried a story on page 7 that Lone Star had acquired a new supply of gas which would be sufficient for the domestic customers of Fort Worth, Wichita Falls, and other North Texas cities at 67½ cents per mcf,—but not Dallas. Mr. Fred Lege, Jr., general manager of Lone Star, announced that Lone Star had acquired the output of gas from the Texas & Pacific Company in Erath County; and Lone Star was building a pipe line to transport it. "The gas from these new sources will be distributed among the cities and towns in North Texas *which have made new contracts with the company,*" Mr. Lege declared. "Dallas will not get any of this gas. * * * We are taking all necessary

steps to protect those cities this winter *which have agreed to the new rates of pay.* When other cities are willing to pay the 67½ cents net, we will endeavor to meet their requirements." * * * "Wichita Falls is to be supplied [by Lone Star] from a new field in Oklahoma."
On June 20, 1920, Lone Star announced acquisition of gas from "its West Texas System" [Palo Pinto County] to serve Fort Worth, Cleburne, Hillsboro, Waco and Corsicana,—but not Dallas. "That situation . . . resolves itself into the controversy about the proposed increased gas rate for Dallas." Dallas News, June 20, 1920, page 5.

10. House Journal, Third Called Session, 36th Legislature, pages 59 and 60.

11. Id. at pages 61–62.

or practically exclusive agency of supply of natural gas to such utility or municipality, *is hereby declared to be [a] virtual monopoly and a business and calling affected with a public interest,* and the said business and property employed therein within this State shall be subject to the provisions of this law and to the jurisdiction and regulation of the Commission as a gas utility.

*"Every such gas utility is hereby declared to be affected with a public interest and subject to the jurisdiction, control and regulation of the Commission as provided herein."*

Section 1(3) of the Cox Act as it now reads in Art. 6050(3) provides:

"Producing or purchasing natural gas and transporting or causing the same to be transported by pipe lines to or near the limits of any municipality in which said gas is received and distributed or sold to the public by another public utility or by said municipality, *in all cases where such business is in fact the only or practically exclusive agency of supply of natural gas to such utility or municipality,* is hereby declared to be virtual monopoly and a business and calling affected with a public interest, and the said business and property employed therein within this State shall be subject to the provisions of this law and to the jurisdiction and regulation of the Commission as a gas utility.

"Every such gas utility is hereby declared to be affected with a public interest and subject to the jurisdiction, control and regulation of the Commission as provided herein."

Section 2 of the Cox Act, as now carried in Article 6051:

"The operation of gas pipe lines for buying, selling, transporting, producing or otherwise dealing in natural gas is a business which in its nature and according to the established method of conduct-

ing the business is a monopoly and shall not be conducted unless such gas pipe line so used in connection with such business be subject to the jurisdiction herein conferred upon the Commission. The Attorney General shall enforce this provision by injunction or other remedy."

The first sentence of Section 3 of the Cox Act came to be codified as Section 1 of Article 6053. In order to facilitate the reading of the section, we have divided the portions of the very long sentence at places where the 1925 revisers placed semicolons. Article 6053 now reads:

"The Commission after due notice shall fix and establish and enforce the adequate and reasonable price of gas and fair and reasonable rates of charges and regulations for transporting, producing, distributing, buying, selling, and delivering gas by such pipe lines in this State;

and shall establish fair and equitable rules and regulations for the *full control and supervision of said gas pipe lines* and *all their holdings* pertaining to the gas business in all their relations to the public, as the Commission may from time to time deem proper;

and establish a fair and equitable division of the proceeds of the sale of gas between the companies transporting or producing the gas and the companies distributing or selling it;

and prescribe and enforce rules and regulations for the government and control of such pipe lines in respect to *their gas pipe lines* and producing, receiving, transporting, *and distributing facilities*;

and regulate and apportion the supply of gas between towns, cities, and corporations, and *when the supply of gas controlled by any gas pipe line shall be inadequate, the Commission shall prescribe fair and reasonable rules and regulations requiring such gas pipe lines to augment their supply of gas,* when in the judg-

ment of the Commission it is practicable to do so;

and it shall exercise its power, whether upon its own motion or upon petition by any person, corporation, municipal corporation, county, or Commissioners precinct showing a substantial interest in the subject, or upon petition of the Attorney General, or of any County or District Attorney in any county wherein such business or any part thereof may be carried on."

The second sentence of Section 3 of the Cox Act became Article 6054. That article says:

"All orders and agreements of any company or corporation, or any person or persons controlling such pipe lines establishing and prescribing prices, rates, rules and regulations and conditions of service, shall be subject to review, revision and regulation by the Commission on hearing after notice as provided for herein to the person, firm, corporation, partnership or joint stock association owning or controlling or operating the gas pipe line affected."

The third sentence of Section 3 became Article 6055 which reads:

"If any rate or charge for gas or for service or for meter rental or any other purpose pertaining to the operation of said business shall be made or promulgated by any person, firm or corporation owning or operating any gas pipe line, or in the event of an inadequate supply of gas or inadequate service in any respect, and complaint against same shall be filed by any person authorized by the preceding article to file such petition and such complaint is sustained in whole or in part, *all persons and customers of said gas pipe line shall have the right to reparation or reimbursement of all excess in charges so paid over and above the proper rate or charge as finally determined by the Commission from and after the date of the filing of such complaint."*

Section 5 of the Cox Act read:

"No such pipe line public utility shall directly or indirectly charge, demand, collect or receive from any one a greater or less compensation for any service rendered than from another for a like and contemporaneous service; provided this shall not limit the right of the Commission to prescribe different rates and regulations for the use of gas for manufacturing and similar purposes, and provided this shall not limit the right of the Commission to prescribe rates and regulations for service from or to other or different places, as it may determine; *nor shall any such utility discriminate in favor of or against any person, place, or corporation, either in apportioning the supply of gas or in its charges therefor."*

This Section 5 of the Cox Act was rearranged in the 1925 revision to read, and the statute now provides:

"Art. 6057. Discrimination. No *such pipe line public utility shall discriminate* in favor of or against any person, place or corporation, *either in apportioning the supply of natural gas or in its charges therefor;* nor shall any such utility directly or indirectly charge, demand, collect or receive from any one a greater or less compensation for any service rendered than from another for a like and contemporaneous service; provided this shall not limit the right of the Commission to prescribe different rates and regulations for the use of natural gas for manufacturing and similar purposes, or to prescribe rates and regulations for service from or to other or different places, as it may determine."

In 1925, the Legislature also revised our Criminal Statutes. It enacted the substance of the provisions of Article 6057 as a separate article, Article 1630, Revised Criminal Statutes of Texas. This Criminal Statute was directed in the new (1973) Penal Code to be transferred back to the civil statutes, and it now appears as

Article 6057a of Vernon's Annotated Civil Statutes. The first two sentences of Section 15 of the Cox Act provided penalties for violations of the Act, including unlawful discrimination:

"Any public utility as herein defined who shall violate any provision of this Act *or who shall fail to perform any duty herein imposed* or who shall fail to comply with any valid order of the Commission when not stayed or suspended by order of court, *shall be subject* to a *penalty* of not less than one hundred dollars nor more than one thousand dollars for each offense, such penalty to be recoverable at suit of the Attorney General of the State of Texas in the name of the State and for its use, each violation to constitute a separate offense, and each day that such failure continues shall constitute a separate offense. *Such penalty together with reasonable attorney's fees may also be recoverable by and for the use of any person, corporation or association of persons against whom there shall have been unlawful discrimination as herein defined*; such suit to be brought in the name of and for the use of the party aggrieved *and may be maintained in any court of proper jurisdiction,* having due regard to the ordinary statutes of venue."

The above section became the substance of Article 6062 in the 1925 Revision which now reads:

"Any public utility as herein defined violating any provision of this subdivision or failing to perform any duty herein imposed or to comply with any valid order of the Commission when not stayed or suspended by order of the court, shall be subject to a penalty payable to the State of not less than one hundred nor more than one thousand dollars for each offense, each violation to constitute a separate offense, and each day that such failure continues shall constitute a separate offense. An additional penalty of a like amount together with reasonable attorney's fees may also be recoverable by and for the use of any person, corporation or association of persons against whom there shall have been unlawful discrimination as herein defined; such suit to be brought in the name of and for the use of the party aggrieved."

The third sentence of Section 15 of the Cox Act read:

"For the *willful* violation of the provisions hereof on the part of persons, firms, and corporations owning, operating, or controlling gas pipe lines it is hereby provided that the owners, officers, agents, and employees of such gas pipe lines who may be guilty thereof shall be deemed guilty of a misdemeanor and each violation of such provisions shall be deemed a separate offense and upon conviction thereof the party violating same shall be fined in a sum not less than fifty dollars nor more than one thousand dollars and may be further punished by confinement in the county jail for not less than ten days, nor more than six months."

In the 1925 Revision of the statutes, this article became Article 1631 of the Revised Criminal Statutes of Texas of 1925. Upon the adoption of the new (1973) Penal Code, this provision was also transferred to the civil statutes. It is now carried as Article 6057b of Vernon's Texas Civil Statutes Annotated.

Section 16 of the Cox Act also provided that if any corporation "shall violate any of the provisions of this Act or any of the rules and regulations of the Commission, the Commission shall . . . apply to any court of this State having jurisdiction . . . thereof for a receivership . . . . Such receiver shall control and manage the property of such gas pipe line under the direction of the court . . . ." The substance of this provision is carried forward as Article 6063. As mentioned earlier, pursuant to an Agreed Judgment entered July 17, 1973, the Judge of the

200th Judicial District selected and maintains an independent Board of Directors for Lo-Vaca which operates that company in accordance with the "plan" set out in the Agreed Judgment.

### THE COMMON PURCHASER ACT

The Cox Act was enacted in a context of *shortage* of natural gas and the alleged monopolistic practices by those owning the available supply which was distributed in North Texas through pipelines.

In 1930, some 10 years later, the reverse situation as to supply was presented. With the development of the East Texas and other fields, Texas was producing vastly more oil than the market could absorb. The price of oil dropped to ten cents a barrel. Legislation was therefore submitted to a special session of the Legislature in 1930,[12] and the Common Purchaser Act was forthcoming. Among other things, the Legislature prohibited *discrimination in the purchase and transportation of oil by pipe line utilities.*

In the early 1930's the Panhandle gas field and others were developed so as to bring in a then overwhelming supply of gas. There were many gas wells with tremendous capacities and reserves, but no market or pipe line connection for the gas. Accordingly in 1931, the Common Purchaser Act was amended to make it applicable to common purchasers of natural gas.[13]

The Act, now Article 6049a, is relevant here because, among other things, it deals with discrimination by purchasers of gas, and with the powers given to the Commission in dealing with the *purchase* of gas, as compared with the powers given the Commission in dealing with the *sale and distribution* of gas under the Cox Act. Some of the same terminology is used as that used in the Cox Act. A comparison of the powers is noteworthy; and as will be observed, the powers given the Commission are much stronger, particularly in carrying out the Act regulating discrimination in the purchase of oil and gas.

Section 2 provides that "no such public utility . . . *shall discriminate* between or against *its patrons* in regard to facilities furnished or *services rendered,* or rates charged . . . ." Section 4 says that the Commission "shall *establish and enforce rules and regulations* governing the character of facilities to be furnished by such utilities . . . ." Section 6a says that "The Commission shall establish and promulgate rates and charges . . . ;" and that "[I]mmediately after this Act shall become effective it shall be the duty of the Commission to hold hearings as to rates now charged [for transportation and delivery by such common carriers] and *shall reset them* on all existing and operating lines . . . ."

Section 6a then says, (and the Cox Act significantly contains no similar provision) "No common carriers by pipe line . . . shall hereafter abandon any of its connections or lines except under authority of a permit granted by the Railroad Commission, or with written consent of the owner . . . ."

In Section 7, the Commission is empowered to require pipe line operators to extend their lines to the extent found [by the Commission] to be reasonable and in the public interest.

Then the Act particularly deals with discrimination: every pipe line is required to "purchase without discrimination" [Sec. 8]. Next it specifically says that, *"the question of justice or reasonableness to be determined by the Railroad Commission*

---

12. Acts 41st Leg., 5th Called Session (1930), Chapter 36, p. 171. Governor Moody's message is at page 175. This Act is codified by Vernon's as Article 6049a.

13. Acts 42nd Legislature, First Called Session 1931, ch. 28, p. 58. The amendments include the addition of Sections 8a, 8aa, and 8b, Vernon's Texas Civil Statutes Annotated, dealing particularly with gas.

. . . ." The Act made it unlawful to discriminate as therein defined. Section 8b provides that "it shall be the duty of the Railroad Commission of Texas to see that the provisions of this Act are fully complied with . . . ."[14]

Section 10 says that "Any person . . . or the Attorney General . . . may institute proceedings *before the Railroad Commission* . . . upon any question relating to the enforcement of this Act, *and jurisdiction is hereby conferred upon said Commission to hear and determine the same* . . . ."

For violation of the provisions of the Act, or rules of the Commission, the Act provides in Section 11 for fines to be recovered in a district court of Travis County. One half of the fine is to go to the person "against whom there shall have been an unlawful discrimination . . . ." In addition, Section 11c says that if anyone is discriminated against, "a cause of action for damages . . . shall lie . . . ", and such person may bring suit for the same *in any court* of competent jurisdiction. Section 11g provides for a similar cause of action "in any court of competent jurisdiction" by royalty owners discriminated against.

This Act was construed in Foree v. Crown Central Petroleum Company, 431 S.W.2d 312 (Tex.1968), in a suit brought directly in the district court for damages for discrimination,—the failure and refusal of a pipe line company to extend its lines to a producer and to purchase gas. It was held that in a suit for damages under the Common Purchaser Act, there need not have been first a finding by the Commission that there had been a past discrimination; that within their respective spheres and powers, both the Commission and the courts had concurrent jurisdiction to find discrimination, and that the Commission had power to act *in those areas in which it had power to grant relief.* On pages 316 and 317 of 431 S.W.2d, this Court recognized that under the Common Purchaser Act, the Commission has broad powers "to hold hearings, make findings, promulgate rules and regulations and enter orders to prevent or to terminate discriminatory practices by common carriers . , . ." The Court continued, "In none of these statutes, however, do we find authority for the Commission to hold hearings and make findings of discrimination *except as incidental to the power to take official action,* i. e., to promulgate rules and regulations or to enter and issue orders." Specifically, the Court held, as relevant here, that "when the administrative agency is powerless to grant the relief sought [it] has no authority to make incidental findings which are essential to the granting of the relief."[15]

## BACKGROUND AND FACTS OF THIS CASE

Before getting into the particulars of this case, it should be stated that there are three types of contractual transactions here involved. They will be more particularly discussed below. We shall designate them in general terms, (1) assignment of re-

---

14. Section 8aa provided that the Act shall apply to any person or corporation operating a gas pipe line whether they be common carrier or not,—and that they too must purchase gas without discrimination. A three-judge federal court held this Section unconstitutional at least as to interstate gas companies who were not common carriers. Texoma Nat. Gas Co. v. R. R. Comm., 59 F.2d 750 (5 Cir., 1932).

15. This Court in the above Foree v. Crown Central Pet. Co. opinion expressly disap-

proved the holding of State v. Crown Central Pet. Corp., 369 S.W.2d 458 (Tex.Civ. App.—1963, writ ref. n. r. e.) which was another phase of that same case. In the disapproved opinion, it had been held that under the Common Purchaser Act, the Commission had *exclusive original jurisdiction* of all complaints of discrimination. This Court ultimately agreed with the substance of the dissent which said, "Resort to the Railroad Commission first would accomplish nothing. The Commission cannot try this case." 369 S.W.2d at 958.

serves, (2) banking, and (3) brokerage. The contract between TUFCO and Lo-Vaca is here treated as an assignment of reserves, and it will also be discussed below. It also has some attributes of the other two. "Banking" of gas generally involves the assignment or transfer [loan] of gas which belongs to some entity to Lo-Vaca. In return, the "lender" has the right to call on Lo-Vaca for the return of the same amount of gas at a future date, and at approximately the same price. This gas, for an additional consideration, is treated by Lo-Vaca; and it flows through its pipelines to Lo-Vaca's customers and back to the lender or the place designated by it. "Brokerage" involves finding a producer with available gas, under circumstances which gives Lo-Vaca, usually under an oral agreement, the right to purchase the gas. The testimony here was that in most instances now before the Court, the price of this gas was such that Lo-Vaca could not afford it. Lo-Vaca thereupon, for a valuable consideration, assigned or sold its right to purchase the gas to a willing buyer or buyers (third parties),—some of whom are intervenors in this case. Contracts are then executed directly between the third-party purchaser of the gas and the corporation having gas for sale. This gas, for a consideration, is also treated by Lo-Vaca and flows through its pipelines, with Lo-Vaca acting as transporter.

We will examine these contracts more particularly shortly; but in general, they are the ones which the City of Austin et al requested the Commission to examine, and to suspend indefinitely the deliveries of gas thereunder.

The Commission was of the view that in all three situations, as the matter reached it, a basic question was, who owned such gas. Who had title to it? This Court, on numerous occasions, has held that the Commission does not have the power or jurisdiction to determine questions of title. Austin, San Antonio, and the LCRA do not question this legal principle, and they did not, before the Commission, put in issue the title to the gas. Their position is that it does not matter whose gas it is, or who has title to the gas,—the Commission has the power and duty under the Cox Act to suspend the deliveries of gas under the various contracts and to apportion gas among the various cities and industrial users, as the public interest may require, because the gas flows in the pipelines of Lo-Vaca.

The Commission relies in part on the case of Railroad Commission v. United Gas Pipe Line Co., 358 S.W.2d 907 (Tex. Civ.App.1962, writ ref. n. r. e.), discussed above. There the Commission had been asked to hold up the new contract between San Antonio and Alamo Gas,—which was assigned to Coastal States, because of the assertion that the contracts were not in the public interest, and that the Commission had the power and duty under the Cox Act to step in. The Commission's decision that it had no such jurisdiction was upheld by the Austin Court of Civil Appeals. The Cox Act did not authorize the Commission to void contracts.

In 1962, Austin likewise decided to terminate its contract with its current gas supplier; and it entered into a long term gas supply contract with Coastal States. Coastal States, in turn, assigned the contract to Lo-Vaca. The date of the LCRA contract with Coastal States does not appear, but it is assumed to be in the early 1960's. Coastal States or Lo-Vaca delivered gas to Austin, San Antonio and the LCRA in a satisfactory manner for many years,—until the energy shortage now with us.

1. *The Assignment of Reserves.*

Meanwhile, Texaco and Gulf Oil Corporation brought in a substantial gas field in far West Texas,—in Reeves and Ward Counties in the general vicinity of Pecos, Texas. In May of 1969, Texaco sold its production of gas in the field to Lo-Vaca

for a period of 18 years. On January 1, 1970, Gulf likewise agreed to sell to Lo-Vaca the gas produced from its wells in the area for 20 years. These contracts are complicated and are contained on 58 printed pages; but we shall assume that for the present purposes, the above is the substance of them.

On September 21, 1970, at a time when there was no emergency in the gas supply, Lo-Vaca entered into a contract with TUFCO. This contract, also, is long (50 printed pages) and complicated. Under the contract, TUFCO and Lo-Vaca agreed to build, and did build, and operate a major pipeline 395 miles in length from a point in Pecos County to a point in Ellis County just below Dallas. There it connected with a pipeline of Lo-Vaca which extended south to serve Lo-Vaca customers. Lo-Vaca, under the contract, also acquired the right to use two pipelines located in Central and East Texas owned by TUFCO. The cost of the pipeline built by TUFCO and Lo-Vaca exceeded $60,-000,000. TUFCO agreed to pay 60% of the cost, and Lo-Vaca 40%; i. e., TUFCO paid or is paying many millions of dollars more than Lo-Vaca for the line; but the line is owned 50–50 under the contract by TUFCO and Lo-Vaca. Generally, each was to have the right to use the actual physical capacity of the line in proportion to their ownership.

In the same agreement, it is stated that "Lo-Vaca does hereby sell, dedicate, commit and assign exclusively to TUFCO,[16] and TUFCO does hereby buy, all the gas deliverable under the [Gulf and Texaco] gas purchase contracts; and to insure the faithful performance hereof, Lo-Vaca does hereby dedicate, commit, and assign exclusively to TUFCO, all of Lo-Vaca's rights to receive and/or purchase gas underlying the lands and leases covered and described in the [Gulf and Texaco] gas purchase contracts." The transfers were evidenced by memoranda of assignments recorded in the various counties.

Under the contract, TUFCO became obligated to pay Gulf and Texaco, over the life of those contracts, for the gas produced and delivered to TUFCO. It was also provided that Lo-Vaca could and would take TUFCO's gas under a banking arrangement for a period of time.

Others having "assignment of reserves" include Clajon Inc., Dow Chemical, and El Paso Natural Gas Company. Substantial consideration was paid to Lo-Vaca by each purchaser for these "assignments of reserves," amounts in the vicinity of 6 million to 7.3 million dollars. The contracts on their face divested Lo-Vaca of title to the gas and vested title in the purchasers. The validity and legality of those contracts is before the district court in Harris County in the *Pennzoil* suit mentioned above.

### 2. *"Banking" of Gas.*

As previously described, "banking" describes a transaction whereby a person or corporation, such as several of the Petitioners in this case, delivers gas to Lo-Vaca at a designated price, coupled with Lo-Vaca's obligation, upon request, to redeliver equivalent amounts of gas at roughly the same price. Under the banking aspects of the transactions, the banking firms did not purchase gas from Lo-Vaca, and their gas was not dedicated to the Lo-Vaca system. They have purchased gas from third parties, with payments therefor going from them to the third parties. When the lenders are "repaid" in the banking transaction, the gas is delivered by Lo-Vaca, with a payment to Lo-Vaca for the transportation.

Those transactions having the aspects of banking include those between Lo-Vaca and AMOCO, American Smelting & Refining Co., Dow, DuPont, Southwestern Refining Company and, as mentioned,

---

16. We have inserted the names Lo-Vaca and TUFCO for "first party" and "second party" as they appear in the contract.

TUFCO, which "banked" some of the gas it had purchased from Lo-Vaca. These "banking" contracts are also before the district court in the *Pennzoil* suit.

The banking arrangement of AMOCO was made in 1968 and 1969, before the Lo-Vaca supply problem was evident. AMOCO has *sold* Lo-Vaca more than 5 times more gas than it has "banked," and it has put into the "bank" with Lo-Vaca substantially *more* gas than it has withdrawn. The transactions, at the time of the Commission's hearing, resulted in a net *inflow to Lo-Vaca* of between 75 and 80 billion cubic feet of gas. It is AMOCO's position that Lo-Vaca is in the position of a bailee of fungible goods; and that under Public Service Electric & Gas Co. v. Federal Power Commission, 371 F.2d 1 (3rd Cir. 1967), title to the gas remains in AMOCO.

Our understanding is that over-all, and as to all those entering into "banking" transactions with Lo-Vaca, there has been a net inflow of gas to Lo-Vaca. However, on some "peak days," or cold days in the winter, there is a net outflow of gas from Lo-Vaca.

### 3. *Brokerage of Gas.*

The term "brokerage" refers to the activities and compensation in arranging for the sale of gas between producers and buyers. The substance of this type of transaction here is that Lo-Vaca had the opportunity to purchase various "blocks" of gas. Instead of formally contracting to take the gas itself, Lo-Vaca sold, or "brokered," the gas to others. Generally, the formal sales or assignments of gas went directly from the producer to the third party purchasers; and Lo-Vaca received substantial fees for such "brokerage." Some of the contracts reveal that Lo-Vaca purchased this gas under a verbal agreement with the producer until such time as Lo-Vaca could arrange for third parties, some of whom are Petitioners here, to contract directly with the producer.

Corporations now before us who have been purchasers under brokerage transactions include American Smelting, Southwestern Refining, and DuPont. They assert that they do *not* buy gas from Lo-Vaca. They say that they buy the gas in the field, pay for it themselves, and transport it to Lo-Vaca's lines; that the reserves, or the lands, producing the gas have never been owned by, or dedicated to, the Lo-Vaca system; and that as far as this record shows, Lo-Vaca had the opportunity to acquire the gas. It did not; and for a consideration (a brokerage fee), it assigned the right to acquire the gas to others.

It is not here contended that the Commission had previously promulgated any rule or regulation prohibiting the contracts entered into. It has made no rule, or at least we are pointed to none; and the Legislature has enacted no statute prohibiting the sale or assignment of reserves, the sale of gas from one utility to another, or to an industrial user without the consent of the Commission, or the sale or assignment of a right to purchase.

### THE COMMISSION'S ORDER IN DOCKET 510

There is a disagreement among the parties hereto as to whether the Commission dismissed the applications of Austin et al. because it considered that it had no jurisdiction over the subject matter, or whether it dismissed the applications without prejudice and to hear and consider the problems in its Docket 520, announced the same day. In its 510 order, the Commission recognized that the *Pennzoil* suit had already been filed in Harris County to determine many of the title and contractual problems raised before the Commission, and that the matters were also before a federal court. The order did state that the Commission had no jurisdiction to decide the title questions.

The order in Docket 510 also stated that the Commission "is of the opinion that its

legal duty and responsibility to protect the public interest extends statewide and that it can require gas utilities in Texas to augment or apportion gas supplies when it is necessary and practicable to do so." The closing paragraph is: "Now, therefore, it is ordered that the subject petition is hereby dismissed without prejudice."

In its Docket 520, promulgated the same day, the Commission stated that it considered it its duty to apportion gas between cities, towns and corporations; that the demand for gas in Texas exceeded the supply; and

"WHEREAS, The Railroad Commission of Texas is of the opinion it must determine (1) the reasonable amount of natural gas required to meet the needs of each category of consumer outlined in the Commission's Order of January 5, 1973, regarding curtailment priorities, in the public interest and to protect the human needs requirements of all Texas citizens; (2) the location and extent of all existing and impending natural gas shortages within the State of Texas; (3) and the location, amount, and availability of any source or supply of natural gas that could be used to alleviate these shortages;

"NOW THEREFORE IT IS ORDERED That notice be and is hereby given . . . that the Railroad Commission of Texas, will . . . hold a hearing for the purpose of hearing evidence and in order to determine whether the available supply of natural gas can be voluntarily shared or apportioned on an equitable basis among the gas utilities to alleviate shortages, and if not, whether the need exists to establish a mandatory statewide apportionment program, and what rules, regulations, procedures and orders, if any, should be established to determine emergencies and lessen or prevent the adverse impact that a serious shortage of natural gas will have on the citizens and economy of Texas."

All gas utilities were directed to submit sworn statements as to their gas reserves, their sales contracts, a complete tabulation of gas sales volumes indicating types of customers, the volume of gas delivered to each type of customer, the alternate sources of fuel other than gas of each utility, and their plans for future energy requirements.

The City of Austin and others sought in Docket 510 to undo and allocate a particular package, or packages, of gas for themselves and for some of Lo-Vaca's other customers in a particular area. The Commission saw the problem as being statewide; and it has undertaken to gather information in its Docket 520 in the context of what can be done to allocate fairly the supply of gas throughout the state on a voluntary basis; and if that cannot be done, what mandatory orders should be promulgated.

The Commission *is* authorized to allocate Lo-Vaca's gas among cities, towns and corporations, and it is already doing so. It also has the jurisdiction and power to allocate TUFCO's gas, and the gas of all other gas utilities among cities, towns and corporations. Thus, the Commission is looking at the gas supply of Lo-Vaca *and* TUFCO, and every other gas utility in the State; and, as we understand it, it proposes to deal with the gas shortage, not as it affects South Central Texas alone, but according to the facts and effect of the shortage, and of its orders upon the entire State. That is the statutory authority of the Commission, and its manner of proceeding is entirely proper. The courts are not bound by the reasons given by Boards or Commissions in their orders, or by any particular ground made the basis of their rulings, provided there is a valid basis for what they do. "It is no longer an open question that such order or ruling may be supported upon a ground different from that recited in the order . . . ." Railroad Commission v. Magnolia Pet. Co., 130 Tex. 484, 109 S.W.2d 967, 971 (1937);

Texas Employment Commission v. Hays, 360 S.W.2d 525 (Tex.1962).

■ Turning again to the application of the City of Austin et al (Docket 510), the "gas supply" in the Lo-Vaca pipeline which they seek to have apportioned includes a substantial amount of gas which seems to be owned by parties which are not gas utilities. In view of the significant issues of ownership which are now in litigation, the Commission was justified in leaving to the courts the judicial resolution of just how much gas was available for Commission disposition. Much of the gas which was the object of the application was then being used to supply cities, people and industry in a very large portion of the state; and the Commission was justified in regarding the matter as requiring attention to the statewide implications. Conceding that there may be areas of concurrent jurisdiction between the courts and the Commission, the Commission is not required always to exercise its jurisdiction in a particular manner. We therefore hold that it was not error for the Commission to dismiss its Docket 510 without prejudice and to proceed with its Docket 520.

## ARTICLE 6053

All of Article 6053 is important. But as a predicate for what is said below, these specific grants of authority to the Commission are repeated.

The statute says that the Commission shall:

1. After due notice, fix reasonable prices (not applicable here) and *make regulations* "for transporting, distributing, *buying, selling, and delivering* gas" by gas utilities.

2. *Establish fair and reasonable rules* for the full control of gas pipe lines *and all their holdings.*

3. Prescribe and enforce rules for the government and control of such pipe lines "in respect to their gas pipe lines and receiving, transporting, and distributing facilities."

4. "and regulate and apportion *the supply* of gas between towns, cities, and corporations, and when *the supply of gas controlled by any gas pipe line* shall be inadequate, the Commission shall prescribe fair and reasonable rules and regulations requiring *such* gas pipe lines *to augment their supply* of gas, when in the judgment of the Commission it is practicable to do so . . . ."

■ Under the above Article, the Commission has jurisdiction to regulate and apportion the sales and disposition of gas owned by each gas utility, so as to protect the public interest. This does not mean that all the gas in Texas is under the full control of the Commission. It may not deprive a person or a corporation which is not a gas utility of gas owned by such person or corporation. The fact that gas owned by someone or some entity other than the gas utility is being transported in a pipeline owned by a utility does not subject that gas to a disposition by the Commission. It may not determine title to gas, nor may it operate retroactively upon a transfer of title to gas.

■■ It may by rule require its approval of sales, or other relevant transactions, by a gas utility; and it may provide by rule that no subsequent transfer of title or rights to gas by any gas utility, without the Commission's approval, can affect the authority of the Commission to direct the use of that gas for supply to towns, cities, or corporations so as to serve the public need.[17] Any such rule or rules, and the

---

17. It is recognized that some gas utilities operating in Texas also operate in interstate commerce and under the jurisdiction of the Federal Power Commission. We do not have before us any question of interference with interstate commerce, and our opinion is not intended to deal with that subject. Lone Star Gas Co. v. Texas, 304 U.S. 224, 58

Commission's actions thereunder, would, of course, be subject to judicial review.

The existence or nonexistence of contracts requiring the delivery of gas by a gas utility does not determine the authority of the Commission to apportion gas owned by that utility among cities, towns and corporations under Article 6053. Referring to the history of the Cox Act set out above, Lone Star had no existing contract with Dallas in 1920. It was no longer a customer. The Cox Act made it plain that the Commission had the power in 1920 to direct the gas utility to apportion its gas supply to cities and towns including Dallas. The Commission serves the public interest which may require a utility to deliver gas to several cities and corporations in amounts at variance with their contracts; and the damages which might be recoverable or not because of unperformed contractual obligations is a matter for the courts to decide. But it is relevant whose gas is being apportioned; and hence the title questions raised, and the statewide gas needs and supply, are also relevant.

The Act also provides that when the supply of gas controlled by any gas pipe line shall be inadequate, the Commission shall prescribe rules and regulations requiring such gas pipe lines to augment their supply when in the judgment of the Commission it is practicable to do so. This is a broad and specific grant of power, and it is not the function of the court to direct the Commission specifically as to how it should exercise its jurisdiction. The supply of Lo-Vaca is inadequate; and if it is considered by the Commission to be practicable, it is its duty to take such steps within its powers to require Lo-Vaca to augment its supply. The same rule would apply to other gas utilities similarly situated. The reasonableness of any such rule or regulation promulgated by the Commis-

sion would, of course, be subject to court review.

Section 5 of the Cox Act, now Article 6057, *prohibits* a pipe line utility from *discriminating "in apportioning the supply of natural* gas or in its charges therefor." As set out in depth above, *this* portion of the Cox Act does not contain a grant of power to the Commission. It contains a *prohibition,*—a "Thou shalt not"; and a material part of this proscription was included in the criminal laws. The remedy, or penalty, set out in the Act for persons or corporations violating this prohibition is set out in Section 15 of the Act, now 6057a, 6057b, and 6062: a monetary penalty in favor of the State and the person or corporation discriminated against (6062). For the willful violation by any officer, director, agent or employee of the discriminating corporation, an additional fine and a term of imprisonment is added. Article 6057a provides an additional remedy for discrimination as to rates and "regulations for service from or to other or different places." Perhaps an ultimate penalty for violations of the Cox Act or any rule of the Commission, including discrimination, is that the offending company may be put into a receivership by a court upon the application of the Commission. Art. 6063. None of these remedies for discrimination provided in the Cox Act delegates to the Commission the power to set aside the contracts here involved or to suspend indefinitely deliveries of gas thereunder. The Commission's powers are those expressly delegated to it; and as held by this Court in Humble Oil & Ref. Co. v. Railroad Commission, supra, such powers are not conferred by implication;—at least no such major powers as are here sought by our Respondents. And, when the Act provides in some detail the remedies for discrimination by a utility where none existed before, other remedies may not be sup-

S.Ct. 883, 82 L.Ed. 1304 (1938) ; i. e., while the statute deals with apportioning the gas supply between cities and towns, we are not

here dealing with allocating gas to cities or corporations outside of Texas.

plied by implication. Deep South Oil Co. v. Texas Gas Corp., 328 S.W.2d 897 (Tex.Civ. App.1959, writ ref. n. r. e.), and see the discussion, supra, of Foree v. Crown Central Pet. Co., 431 S.W.2d 312 (Tex.1968). This is not to say that the Legislature cannot provide other remedies. It is to say that it has not.

In view of our holdings, we do not reach the constitutional questions raised by TUFCO et al.

As stated, our judgment is that the Commission did not err in dismissing without prejudice its Docket Number 510, and that it may proceed with its statewide hearing in its Docket Number 520 under the powers and jurisdiction set out above. Accordingly, the judgments of the courts below are reversed, and judgment is here rendered that Respondents, the City of Austin et al., take nothing by reason of their appeal from such order of the Commission.

WALKER, J., not sitting.

## ON REHEARING

POPE, Justice (dissenting).

In my opinion, the courts below have correctly decided this case and the Railroad Commission had jurisdiction to entertain the petition. In fact the majority, while reversing those judgments, makes direct holdings that the Commission has jurisdiction over the gas controlled by the two public utilities, Lo-Vaca and TUFCO. The court expressly holds that the Commission has power:

"to allocate Lo-Vaca's gas among cities, towns and corporations, and is already doing so.

"to allocate TUFCO's gas, and the gas of all other gas utilities among cities, towns and corporations.

"to deal with the gas shortage . . . according to the acts and effect of the shortage, and of its orders upon the entire State.

"to regulate and apportion the sales and disposition of gas owned by each gas utility, so as to protect the public interest.

"to require a utility to deliver gas to several cities and corporations in amounts at variance with their contracts, and the damages which might be recoverable or not because of unperformed contractual obligations is a matter for the courts to decide."

Since Lo-Vaca and TUFCO are subject to the Cox Act powers, the Commission possessed jurisdiction and Docket No. 510 should not have been dismissed.

The facts are not developed concerning many matters recited in the majority opinion. The Commission entertained evidence only as it bore upon the title dispute about ownership of gas and for the limited purpose of determining its jurisdiction. We do not have a development of the facts about the purposes or progress in the Commission's exercise of its powers under Docket 520, but the majority has concluded that Docket 510 was properly dismissed because Docket 520 is still pending. At the trial court level, counsel for the Commission was asked two times by opposing counsel and one time by the court whether in Docket 520, "the Commission will investigate these transactions and these alleged discriminations." His answer was "No." Docket 510 was filed first. It was not held in abeyance; it was not consolidated with Docket 520; it was not dismissed for an orderly control of the Commission's docket and for consideration in Docket 520. It was dismissed for want of jurisdiction.[1]

---

I. Whereas the Commission is of the opinion and finds that the instant Application brings into issue contractual transactions in the circumstances surrounding the intent, purpose

and execution thereof; and these matters are in litigation in both State and Federal District Courts; *and that such issues in such litigation are not subject to Railroad Commis-*

One wonders why the Commission lacks jurisdiction of the subject matter in Docket 510 but has it in Docket 520. The question posed before this court is clearly that of the Commission's jurisdiction.

I disagree with the majority view that a dispute over contract rights and ownership of gas can oust the Commission of its Cox Act powers to protect the public. The Commission operates upon gas owned or controlled by a public utility; the courts adjust the title questions and award damages. I would hold that, just as the courts may not be ousted from their jurisdiction over title questions and the validity of contracts by an administrative proceeding before the Railroad Commission; the Commission is not divested of its jurisdiction by a collateral lawsuit concerning title or rights under contracts. We have so ruled. Magnolia Petroleum Co. v. Edgar, 62 S.W. 2d 359 (Tex.Civ.App.1933, writ ref'd).

I disagree with the majority view that gas which Lo-Vaca sold outright has escaped the powers detailed by the Cox Act. Particularly is this so, when the Lo-Vaca gas that was sold to TUFCO did not so escape. Since 1920, when the Cox Act was enacted, public utilities and those who deal with them have been subject to Article 6054 which vests jurisdiction in the Commission over all orders and agreements on hearing after notice. That article provides:

> Art. 6054. *All* orders and *agreements of any company* or corporation, or any person or persons controlling such pipe lines establishing and prescribing prices, rates, rules and regulations and conditions of service, shall be subject to review, revision and regulation by the Commission on hearing after notice as provided for herein to the person, firm, corpora-

tion, partnership or joint stock association owning or controlling or operating the gas pipe line affected. Acts 1920, 36th Leg., 3rd C.S., p. 18, ch. 14, § 3. (Emphasis added.)

The Cox Act is cumulative of the common law applicable to public utilities, and it is settled that a utility may not disable itself or impair its power to perform duties owing the public. Gibbs v. Consolidated Gas Co., 130 U.S. 396, 9 S.Ct. 553, 32 L.Ed. 979 (1889); Lone Star Gas Co. v. Municipal Gas Co., 117 Tex. 331, 3 S.W.2d 790 (1928); Gulf, C. & S. F. Ry. Co. v. Morris, 67 Tex. 692, 4 S.W. 156 (1887); Gulf Pipeline Co. v. Lasater, 193 S.W. 773 (Tex.Civ. App.1917, writ ref'd). I would hold that the public interest and the Commission powers under the Cox Act attached to the Lo-Vaca gas when Lo-Vaca acquired the reserves necessary to fulfill its long-term public commitments, and that the public interest and Commission powers follow those reserves into the hands of whoever acquired them. Unless this is the correct rule, the majority holding means that if Lo-Vaca had sold all, instead of half of its reserves, the Cox Act would have been wholly defeated.

Section 1 of Article 6053 confers broad jurisdiction upon the Commission. It is better understood when we break it into its parts and add letters to enable better identification. It says:

The Commission after due notice

a.) shall fix and establish and enforce the adequate and reasonable price of gas and fair and reasonable rates of charges and regulations for transporting, producing, distributing, buying, selling, and

---

*sion jurisdiction*; and that the oral arguments, briefs and record evidence presented herein to the Commission further raises a multitude of issues regarding title and property rights of both utility and non-utility

buyers, sellers and consumers, in and to natural gas, which *are inherently judicial in nature and beyond those powers conferred upon the Commission.* (Emphasis added.)

delivering gas by such pipe lines in this State;

b.) and shall establish fair and equitable rules and regulations *for the full control and supervision of said gas pipe lines and all their holdings pertaining to the gas business in all their relations to the public,* as the Commission may from time to time deem proper;

c.) and *establish a fair and equitable division of the proceeds of the sale of gas between the companies transporting or producing the gas and the companies distributing or selling it;*

d.) and *prescribe and enforce rules and regulations for the government and control of such pipe lines in respect to their gas pipe lines* and producing, receiving, transporting, and distributing facilities;

e.) and *regulate and apportion the supply of gas between towns, cities, and corporations, and when the supply of gas controlled by any gas pipe line shall be inadequate, the Commission shall prescribe fair and reasonable rules and regulations requiring such gas pipe lines to augment their supply of gas,* when in the judgment of the Commission it is practicable to do so;

f.) and it shall exercise its power, whether upon its own motion or upon petition by any person, corporation, municipal corporation, county, or Commissioners precinct showing a substantial interest in the subject, or upon petition of the Attorney General, or of any County or District Attorney in any county wherein such business or any part thereof may be carried on. As amended Acts 1939, 46th Leg., p. 501, § 1. (Emphasis added.).

The provisions designated (a), (e) and (f) have no requirement for advance rules. The statute carries its own power. It is self-enacting. The significant provision is the first part of (e), which omits the requirement for rules in advance and em-

powers the Commission to "regulate and apportion the supply of gas between towns, cities, and corporations . . .." While the case of State v. Public Service Corporation, 88 S.W.2d 627 (Tex.Civ.App.1935, writ ref'd) did not involve the precise question posed here, it did involve the general scope of the Commission's jurisdiction, and considered the same statutes which we are charged with construing. It concluded:

The aforementioned statutes [Articles 6050, 6051, 6052, 6053, 6023, and 1119] show the legislative intent to confer *full and plenary* authority, power and jurisdiction . . . ultimately upon the Commission, to *completely* regulate, control, and govern the natural gas industry in all of its phases . . . . (Emphasis added.)

The later case of Terrell v. Community Natural Gas Co., 117 S.W.2d 838 (Tex.Civ. App.1938, writ dism'd) contains this language:

The provisions of Art. 6053, supplemented by other provisions found in the statute germane to the subject, we think, have the effect of conferring upon the Commission an overlordship control and supervision of the affairs of gas utilities in regard to all matters, as expressed in the statute, "pertaining to the gas business in all their relations to the public, as the Commission may from time to time deem proper."

A similar question occurred in 1947, when the City of Miami, Texas, was unable to obtain a supply of gas. Mobeetie Gas Company had contracted in 1928 with certain individuals who held the franchise to supply gas to the City of Miami for a period of twenty years. Mobeetie had no contract with Miami, and it intended to stop its supply to the franchisees at the end of twenty years. When the question arose in 1947, the Railroad Commission sought an opinion of the Attorney General who also concluded that the gas supplier, even without a contract, was not free to stop its sup-

ply to the public in need.[2] The Railroad Commission took jurisdiction of the dispute and refused the utility's request to discontinue its gas service until the City of Miami obtained another source of gas. The court of civil appeals, on review, dismissed the case as moot by reason of the city's obtaining another gas supply; however, the court by way of dicta stated that the Commission should pass on the right of other rural users to continued service, concerning which the court said, "and its jurisdiction to do so cannot be here denied." Public Service Commission v. Railroad Commission, 215 S.W.2d 213 (Tex.Civ.App. 1948, no writ).

And if rules in advance are necessary to apportion gas even though the statute does not so require, the Commission has jurisdiction to make those rules ancillary to its proceedings in Docket 510. Presently the subject matter is dismissed and while it has been forty-five years since the Cox Act was enacted, the record does not reveal that the rules are even yet under consideration. I would hold that the administrative agency surely has jurisdiction in Docket 510 to make suitable rules.

I would affirm the judgments of the courts below which hold that the Commission has jurisdiction to entertain Docket 510.

2. By virtue of Article 6053, supra, the Commission is empowered with *"full control* and *supervision* of said gas pipe lines and all their holdings pertaining to the gas business *in all their relations to the public."* It is further empowered with the *"government* and *control* of such pipe lines in respect to their gas pipe lines and producing, receiving, transporting, and distributing facilities" and empowered to *"regulate* and apportion the supply of gas controlled by any gas pipe line." It may exercise its power upon "its own motion or upon petition."

It would be an empty "jurisdiction" and an empty "full control" if the Commission could not continue a service by a utility. Otherwise the utility could abandon at will and bargain on that basis.

SUMMARY

1. It is necessary for the Public Service Corporation, a "gas utility" as defined by our statutes (Article 6050, V.C.S.), to have the consent of the Railroad Commission to discontinue the furnishing of gas to the distributor for the City of Miami. State ex rel. Public Service Commission v. Missouri Southern R. Co. (1919), 279 Mo. 455, 214 S.W. 381, 384; State v. Kansas Postal-Telegraph-Cable Co. (Sup.Ct.Kans.1915), 96 Kan. 298, 150 P. 544, 547.

2. A hearing must be held by the Commission on an application of a "gas utility" for requested permission to discontinue service to a municipality. Article 6053, V.C.S. Atty. Gen'l Op. No. V–309, Daniel (1947). (Emphasis added.)