**The STATE of Texas and the General Land Office of the State of Texas, Petitioners,**

v.

**FLAG–REDFERN OIL COMPANY, Respondent.**

**The STATE of Texas, the General Land Office of the State of Texas, and Garry Mauro, Petitioners,**

v.

**RUTHERFORD OIL CORPORATION, Conoco, Inc., and Ladd Petroleum Corporation, Respondents.**

Nos. D–0872, D–0874.

Supreme Court of Texas.

May 19, 1993.

Concurring Opinion filed by Justice Gonzalez March 3, 1993.

Jose Manuel Rangel, Liz Bills, Priscilla M. Hubenak, Dan Morales, Will Pryor, Mary F. Keller, and Ed Salazar, Austin, for petitioners.

P.M. Schenkkan, David B. McCall, Tom C. McCall, Stephen B. O'Connell, Elizabeth M. Marsh, Patrick F. Thompson, Mary Barrow Nichols and Eva C. Ramos, Austin, and Steven C. Kiser, Midland, for respondents.

## OPINION ON MOTION FOR REHEARING

SPECTOR, Justice.

The Respondents' motion for rehearing is overruled. The court's opinion of March 3, 1993 is withdrawn, and the following is substituted therefor.

These two causes were submitted together because both involve the authority of the Texas General Land Office to determine contract rights under state mineral leases.[1] In each cause, the court of appeals affirmed a summary judgment granting declaratory relief on the ground that the Natural Resources Code does not authorize the General Land Office to adjudicate such contract rights. We conclude that the Texas Legislature, in enacting the relevant provisions of the Natural Resources Code, intended to authorize the General Land Office to interpret and apply contractual provisions in state mineral leases. We further conclude, however, that the relevant code provisions, insofar as they require lessees to prepay disputed amounts before contesting the agency's determinations in court, are unconstitutional. We therefore affirm the judgments of the court of appeals in favor of the lessees, though on grounds other than those articulated by the courts below.

### I.

The present disputes arise from recent statutory changes affecting the Texas Land Commissioner's long-standing authority to conduct audits. Since 1919, Texas statutes have provided that the books, accounts, and other records of oil and gas lessees on state lands are subject to "inspection and examination" by certain state

1. The issue in this case is the same one recognized, though not resolved, in *General Land Office v. OXY U.S.A., Inc.,* 789 S.W.2d 569 (Tex. 1990). In that case, we dismissed the State's direct appeal as moot because the plaintiff, OXY, had taken a non-suit.

officers, including the Commissioner of the General Land Office.[2] In 1986, the Texas Legislature expanded on that provision by creating new procedures for the assessment, collection and redetermination of oil and gas royalties due to the State.[3] *See* Tex.Nat.Res.Code § 52.135. As revised, the statute requires the Commissioner of the General Land Office to send a lessee an "audit billing notice" whenever the Commissioner determines, after inspection of the lessee's records, that additional royalties are due. § 52.135(b). Upon receiving the billing notice, the lessee has thirty days in which to either pay the deficiency or request a hearing before the Commissioner for redetermination of the assessment. § 51.135(c).

The 1986 act also established a new mechanism for suits to protest deficiency assessments. *See* Tex.Nat.Res.Code § 52.-137. If a lessee who has received a deficiency assessment chooses to forego a hearing before the Commissioner, or is dissatisfied with an order issued by the Commissioner after a hearing, the lessee must pay the deficiency under protest within thirty days. § 52.137(a). The lessee then has ninety days to bring suit in Travis County to recover the payment. § 52.-137(c). Trial on the disputed issues is de novo, and the substantial evidence rule does not apply. § 52.137(e).

All four of the respondents are lessees facing deficiency assessments as a result of audits conducted by the General Land Office. In each case, the deficiency assessment is based largely on a determination that the lease involved is not a "market value" lease, so that royalties cannot be calculated on the basis of gross proceeds. To dispute that determination, each of the

Lessees initially requested a hearing under section 52.135(c) of the Texas Natural Resources Code. Before the hearings were concluded, however, each of the Lessees filed suit challenging the authority of the General Land Office to make such a legal determination in the course of conducting an audit.

After filing suit, Rutherford Oil Corporation and others[4] sought a temporary injunction to prevent the General Land Office from proceeding with the hearings under section 52.135(c). The trial court initially granted the temporary injunction, but later dissolved it. The court of appeals then ordered the trial court to reinstate the injunction, stating that the General Land Office had no authority to adjudicate lease rights. *Rutherford Oil Corp. v. General Land Office*, 776 S.W.2d 232 (Tex.App.—Austin 1989, no writ) ("*Rutherford I*").

After *Rutherford I*, the trial court granted summary judgment for Rutherford on the grounds that sections 52.135 and 52.137 of the Texas Natural Resources Code do not permit the General Land Office to adjudicate contract rights under state mineral leases, and that the administrative hearings which the General Land Office proposed to hold would violate this holding. The trial court also denied the State's cross-motion for summary judgment.

In a separate proceeding in the same trial court, Flag–Redfern Oil Company sought relief similar to that sought by Rutherford. Just as in the Rutherford case, the trial court granted Flag–Redfern's motion for summary judgment and correspondingly denied the State's cross-motion for summary judgment.

---

**2.** The original act stated in part:

> The books and accounts, the receipts and discharges of all lines, tanks, pools and meters, and all contracts and other records pertaining to the production, transportation, sale and marketing of the oil and gas shall at all times be subject to inspection and examination by the Commissioner of the General Land Office, the Attorney General, the Governor, or the representative of either.

Act of July 21, 1919, ch. 19, § 6, 1919 Tex.Gen. Laws 51, 53. The current language is nearly identical. *See* Tex.Nat.Res.Code § 52.135.

**3.** Act of Sept. 17, 1986, ch. 5, 1986 Tex.Gen.Laws 4.

**4.** Rutherford Oil and Conoco jointly hold two leases, and filed suit together. The trial court subsequently consolidated their suit with a suit filed by Ladd Petroleum. Unless otherwise indicated, references to Rutherford refer to all three lessees.

On appeal, the State asserted in both cases that sections 52.135 and 52.137 confer on the General Land Office full authority to interpret lease provisions in the course of conducting audits. The court of appeals rejected that argument in *Rutherford II*, 802 S.W.2d 65. Reasoning that "[o]nly courts are empowered to determine controverted property rights," the court of appeals held that the term "audit" in section 52.135 "only contemplates an examination for accounting-type errors resulting in royalty deficiencies." 802 S.W.2d at 68–69. For that reason, the court of appeals affirmed the summary judgment as to Rutherford. *Id.* at 69. Additionally, in a separate decision based on the reasoning of *Rutherford II*, the court of appeals summarily affirmed the trial court's summary judgment as to Flag–Redfern. 852 S.W.2d 539.

## II.

The State urges that the lower courts' interpretation of section 52.135 is inconsistent with the legislature's intent in enacting the 1986 amendments. We agree.

Nothing in section 52.135 expressly states that the General Land Office, in examining lessees' records, is restricted to searching for "accounting-type errors." On the contrary, the provisions added in 1986 indicate that the legislature fully expected the General Land Office to make legal determinations in the course of conducting its examinations. The new provisions require a lessee requesting a hearing to submit "[a] statement of grounds setting out in detail the lessee's reasons for disagreement with such assessment and the factual *and legal* grounds on which the claim is based." § 52.135(c) (emphasis added). If the legislature had intended the examination and hearing to focus solely on "accounting-type errors," it would not have required the lessee to raise legal arguments in requesting a hearing. The statute also requires the Commissioner of the General Land Office, upon determining that additional royalties are due, to notify the lessee of the "reasons for such determination." § 52.135(c). The reasons would require little explanation if the determination were based only on accounting errors.

The legislative history of the 1986 amendments supports the view urged by the State. According to the bill analysis that accompanied the amendments in the Senate, the General Land Office had already begun a "systematic audit program" before the 1986 amendments, and had issued deficiency assessments totalling more than $20 million. Suit had been filed, however, challenging the authority of the General Land Office to conduct such audits; so the legislature passed the amendments "to provide for an orderly resolution of the issues relating to these royalties and their payment to the state at the earliest possible date." SENATE COMM. ON FINANCE, BILL ANALYSIS, Tex.H.B. 32, 69th Leg., 3rd C.S. (1986). Thus, one apparent purpose of the 1986 amendments was to confirm a broad role for the Commissioner of the General Land Office in conducting audits and preparing deficiency assessments.

Considering the history and purpose and section 52.135, we conclude that the legislature cannot have intended to confine the Commissioner of the General Land Office to reviewing state mineral leases for "accounting-type errors." Such an interpretation would accord the Commissioner no more authority than his office has had since the 1919 act making lessees' records subject to inspection and examination. We decline to construe the act in a manner that would effectively thwart the legislature's purpose in enacting the statute.

## III.

The court of appeals based its reading of section 52.135 mainly on constitutional grounds: a broader interpretation of the Commissioner's authority would render the statute unconstitutional, the court reasoned, because "[o]nly courts are empowered to determine controverted property rights." 802 S.W.2d at 68. While we agree that only courts may render binding judgments in lease disputes, we disagree with the court of appeals' application of that principle to this case.

The Texas Constitution divides the powers of government into three departments, and expressly provides that "no person, or collection of persons, being of one of these departments, shall exercise any power properly attached to either of the others," except in certain specified instances. Tex. Const. art. II, § 1. Applying this provision, both the *Rutherford I* court and the *Rutherford II* court held that the State's interpretation of section 52.135 would violate the separation of powers insofar as it would allow the General Land Office, an executive agency, to exercise a judicial function. Both courts based this view largely on this court's decision in *Board of Water Engineers v. McKnight*, 111 Tex. 82, 229 S.W. 301 (1921), in which we held that "no power is more properly or certainly attached to the judicial department than that which determines controverted rights to property by means of binding judgments." 229 S.W. at 304. Both courts also cited two cases involving the Railroad Commission's authority to adjudicate disputes: *Railroad Commission v. City of Austin*, 524 S.W.2d 262, 267–68 (Tex.1975), and *Magnolia Petroleum Co. v. Railroad Commission*, 141 Tex. 96, 170 S.W.2d 189, 191 (1943). *Id.*

The hearings contemplated by section 52.135 are markedly different from those disapproved in the cited cases. In *McKnight*, an irrigation company had instituted a proceeding before the Board of Water Engineers "for the determination of the relative rights of various claimants to the waters of the Pecos River." 229 S.W. at 301. The Board itself had no interest in the proceedings; it was actually adjudicating the relative rights of private parties. The same distinction applies to *City of Austin* and *Magnolia Petroleum Co.:* both involved adjudications of disputes between private parties. *See City of Austin,* 524 S.W.2d at 268; *Magnolia Petroleum Co.,* 170 S.W.2d at 191.

In the present case, the State is a party to the disputed leases; and as a lessor, the State may reassess its rights under the lease as a matter of course. *See Anderson v. Robison,* 111 Tex. 402, 406–07, 229 S.W. 459, 460 (1921) ("[W]hen the state becomes a party to a contract with a citizen, the same law applies to it as under like conditions governs the contracts of individuals."). Section 52.135 merely allows a lessee to participate in the State's reassessment of its rights. A hearing under section 52.135 is thus no different, in principle, from routine decision-making by any ordinary lessor.

To the extent that section 52.135 merely allows the State to reassess its position with regard to state mineral leases, rather than to subject participants to binding judgments, we hold that the statute does not offend article II, section 1 of the Texas Constitution. *See Fristoe v. Blum,* 92 Tex. 76, 85, 45 S.W. 998, 1002 (1898).[5]

## IV.

The Lessees complain, however, that hearings under section 52.135 do result in binding judgments, because judicial review is unavailable until the lessee pays the disputed amount in full. *See* § 52.137(a). This prepayment requirement, the Lessees assert, violates their constitutional rights of access to the courts.[6] We agree.

5. "It is said that the power conferred upon the commissioner of the land office is judicial; but, in our opinion, the act is no more judicial when performed by the commissioner of the general land office on behalf of the state than it would be if done by an individual vendor or his agent."

6. The Lessees urged this view, along with a number of other constitutional arguments, as alternative grounds for summary judgment. In both cases, the trial court confined its ruling to the grounds concerning statutory construction.

Ordinarily, when a trial court has specified the ground on which it was granting summary judgment, we must remand the cause to allow the trial court to rule on the remaining grounds. *See City of Houston v. Clear Creek Basin Auth.,* 589 S.W.2d 671, 675–77 (Tex.1979); *cf. Rogers v. Ricane Enters., Inc.,* 772 S.W.2d 76, 79 (Tex. 1989) (when summary judgment order does *not* specify ground for ruling, summary judgment will be affirmed on any meritorious theory advanced). Here, though, the statutory construction issue is intertwined with constitutional issues: the viability of the State's suggested interpretation depends on whether its determinations under section 52.135 would be binding, which depends in turn on the enforceability of the prepayment requirement. We address the

Article I, section 13 of the Texas Constitution provides in part that "[a]ll courts shall be open, and every person for an injury done him, in his lands, goods, person or reputation, shall have remedy by due course of law." This provision "specifically guarantees all litigants the right to redress their grievances—to use a popular and correct phrase, the right to their day in court." *LeCroy v. Hanlon,* 713 S.W.2d 335, 341 (Tex.1986). Because access to the courts is a "substantial right," *id.,* we have construed the open courts provision to guarantee access to the courts unimpeded by unreasonable financial barriers. Thus, the legislature cannot impose filing fees to support the state's general revenue, *id.* at 342; nor can it require prepayment of administrative penalties as a prerequisite to judicial review. *Texas Ass'n of Business v. Texas Air Control Bd.,* 852 S.W.2d 440 (Tex.1993).

The legislative history of section 52.137(c) indicates that the State's only interest in the prepayment requirement is its financial interest in immediate access to disputed royalty payments. *See* House Research Organization, Bill Analysis, Tex. H.B. 32, 69th Leg. (1986) ("The state would gain by having access to the royalty payments immediately, without having to wait two or three years for a lessee to exhaust judicial remedies."). Of course, a similar financial interest could be asserted in defense of any financial impediment to judicial review, including filing fees like those struck down in *LeCroy v. Hanlon,* 713 S.W.2d at 342.

We conclude that the prepayment requirement of section 52.137, like the filing fees at issue in *LeCroy,* constitutes an unreasonable interference with access to the courts. Under these circumstances, the open courts provision prohibits the State from conditioning judicial relief on prepayment of the sums in dispute.

### V.

■ To the extent that the term "adjudication" implies a binding determination, we agree with the courts below that the General Land Office is not authorized to "adjudicate" controverted property rights. But we disagree with the suggestion that the hearings contemplated by the General Land Office under section 52.135 exceed its constitutional and statutory authority. We hold, instead, that section 52.135 of the Texas Natural Resources Code authorizes the Commissioner of the General Land Office to conduct full-scale audits, encompassing legal as well as factual determinations, and to hold hearings for the redetermination of deficiency assessments.

A lessee may still challenge the State's determinations in the manner prescribed in section 52.137. Independent of the prepayment requirement, section 52.137 requires a lessee challenging a deficiency assessment to submit a written protest to the Commissioner of the General Land Office within thirty days. § 52.137(a). The lessee may then bring suit in Travis County within ninety days after the date of the protest or the date of the commissioner's final order following a hearing, whichever is later. § 52.137(a). A lessee who foregoes these procedures, and simply refuses to pay a deficiency assessment, risks forfeiture of its rights under the lease. *See* § 52.176. These requirements, we hold, do not unreasonably restrict lessees' right of access to the courts. *See Gutierrez v. Lee,* 812 S.W.2d 388, 393 (Tex.App.—El Paso 1991, writ denied) (three-month limitations period did not violate the open courts provision). Nor do these requirements convert the agency's assessment and reassessment process into a binding adjudication for constitutional purposes. *See Beyer v. Employees Retirement Sys.,* 808 S.W.2d 622, 627 (Tex.App.—Austin 1991, writ denied).[7] However, because the prepayment require-

---

constitutional issues here only to the extent necessary to construe the statutes.

7. "An administrative agency is not a 'court' and its contested case proceedings are not lawsuits, no matter that agency adjudications are sometimes referred to loosely as being 'judicial' in

nature. Agency adjudications do not reflect an exercise of the judicial power assigned to the 'courts' of the State in Tex. Const.Ann. art. V, § 1 (Supp.1991); they are simply executive measures taken in the administration of statutory provisions."

ment of section 52.137(a) offends the open courts provision, Tex. Const. art. I, § 13, the lessee need not make a protest payment before bringing suit.

For the reasons stated, we affirm the judgments of the court of appeals.

Concurring opinion by GONZALEZ, J.

GONZALEZ, Justice, concurring.

I agree with the Court that the conditioning of judicial review on prepayment of disputed additional royalties as provided by TEX.NAT.RES.CODE ANN. § 52.137(a) violates the open courts provision of the Texas Constitution. However, I disagree with the remainder of the Court's opinion.

The Court states that "the Texas Legislature, in enacting the relevant provisions of the Natural Resources Code, intended to authorize the General Land Office to **interpret** and **apply** contractual provisions in state mineral leases." Majority Opinion at 481 (emphasis added). Nonetheless, the Court affirms the judgment of the court of appeals on the ground that the General Land Office ("GLO") is not authorized to "adjudicate" controverted property rights. At 485. I agree instead with the reasoning of the court of appeals. The plain meaning of the term "audit" in TEX.NAT.RES.CODE ANN. §§ 52.135 and 52.137 does not connote adjudication of controverted property rights. Even if it did, the statute would not pass constitutional muster because only courts are empowered to adjudicate controverted property rights. 802 S.W.2d at 68; *see also Board of Water Engineers v. McKnight*, 229 S.W. 301 (Tex.1921); *Rutherford Oil Corp. v. General Land Office*, 776 S.W.2d 232 (Tex.App.—Austin 1989, no writ).

Since 1919, the Natural Resources Code and its predecessors have authorized the "inspection and examination" by the GLO (and various other state officials) of the books, accounts, and records of oil and gas lessees on state lands. Before 1986, however, the GLO was not authorized by Chapter 52 to do anything beyond the inspection and examination of the records. If the GLO discovered an error in the lessee's compliance with the lease, it was required to request the attorney general to file suit and obtain a judgment to correct the errors.

In 1986, the Texas Legislature amended the Natural Resources Code to expand the enforcement powers of the GLO. The GLO prior to 1986 had commenced a "systematic audit program" which issued deficiency assessments totalling more than $20 million. This program was challenged on the basis that the agency did not have the authority to conduct such audits. According to the bill analysis that accompanied the amendments in the Texas Senate, the purpose of the statutes was "to provide for an orderly resolution of the issues relating to these royalties and their payment to the state at the earliest possible date." SENATE COMM. ON FINANCE, BILL ANALYSIS, Tex.H.B. 32, 69th Leg., 3d C.S. (1986).

The revised statutes now provide that the GLO must send a lessee an "audit billing notice" when the GLO determines, after inspection and examination of the lessee's records, that additional royalties are due. TEX.NAT.RES.CODE ANN. § 52.135(b) (emphasis added). Upon receipt of this audit billing notice, the lessee has 30 days to pay the "audit deficiency assessment" or to request a hearing before the GLO for redetermination of the assessment. *Id.* § 52.-135(c) (emphasis added). If a hearing is requested, the lessee must submit a statement of factual and legal grounds on which the lessee disputes the assessment. *Id.* If the lessee chooses to forego a hearing, or if the lessee is dissatisfied with the outcome of the hearing, then the lessee must pay the audit deficiency assessment under protest. *Id.* § 52.137(a). The lessee may then bring a suit to recover the payment, with trial on the disputed issues being de novo. *Id.* § 52.137(c), (e).

The court of appeals held that § 52.135 only contemplated "an examination for accounting-type errors resulting in royalty deficiencies." 802 S.W.2d at 69. I agree. Section 52.135 uses the word "audit" four times, three times to modify "billing notice" and one time to modify "deficiency

assessment." [1] The other amended statutes likewise continue to use the word "audit" to modify "billing notice" and "deficiency assessment." *See id.* §§ 52.137, 52.-139, & 52.140 (emphasis added). When the legislature enacts a statute, a presumption exists that every word in the statute possesses a significant purpose and meaning. *Cameron v. Terrell & Garrett, Inc.*, 618 S.W.2d 535, 540 (Tex.1981); *Bomar v. Trinity Nat. Life & Accident Ins. Co.*, 579 S.W.2d 464, 465 (Tex.1979). In other words, the legislature presumptively included the word "audit" for a purpose in § 52.135; some meaning must have been intended by the use of the phrases "audit billing notice" and "audit deficiency assessment" which would not have been present by the use of just "billing notice" and "deficiency assessment." In determining how the word "audit" limits the scope of § 52.135, we are to consider the plain and ordinary meaning of the word "audit" since the legislature did not specifically define the term. *Hopkins v. Spring Ind. School Dist.*, 736 S.W.2d 617, 619 (Tex.1987); *Big H Auto Auction, Inc. v. Saenz Motors*, 665 S.W.2d 756, 758 (Tex.1984).

The ordinary meaning of the term "audit" does not denote a legal inquiry or the construction of the terms of a document; rather, an audit is "a formal or official examination and verification of books of accounts." WEBSTER'S THIRD NEW INT. DICTIONARY 143 (19th ed. 1962). Another court decision of this state has similarly concluded that an audit is just an examination and verification of books and accounts. *See May v. Wilcox Furniture Downtown, Inc.*, 450 S.W.2d 734, 739 (Tex.Civ.App.—Corpus Christi 1969, writ ref'd n.r.e.). The legislature itself recognized the limited meaning of "audit" since the other statutory amendments to Chapter 52 of the Texas Natural Resources Code use the terms "audit," "examination," and "inspection" virtually synonymously.[2]

Because the term "audit" has a specific meaning that the legislature recognized, we must presume the word was intended to limit the scope of the statute. Section 52.-135 thus must be interpreted, under its plain meaning, to apply only to accounting-type errors, not to legal determinations on the proper construction of an oil and gas lease. Therefore, any action by the GLO in

1. Section 52.135 provides:
   (a) The books and accounts, receipts, and discharges of all lines, tanks, pools, and meters and all contracts and other records relating to the production, transportation, sale, and marketing of the oil and gas are subject at any time to inspection and examination by the commissioner and the attorney general and governor or their representatives.
   (b) If, after inspection and examination of books, accounts, reports, or other records, the commissioner or his representative determines that additional royalties are due under a lease of state land or minerals, the commissioner shall send to the lessee by certified mail, return receipt requested, an **audit billing notice** notifying the lessee of such additional royalties, and interest and penalty, due and of the reasons for such determination.
   (c) The lessee shall have 30 days from the date of the receipt of such **audit billing notice** in which to pay such **audit deficiency assessment** or to request a hearing before the commissioner of his representative for redetermination of such assessment. A statement of grounds setting out in detail the lessee's reasons for disagreement with such assessment and the factual and legal grounds on which the claim is based must be submitted by a lessee with its request for a hearing. Such hearing shall be conducted in accordance with the rules and procedures established by the commissioner.
   (d) In order to stop the further accrual of penalty or interest, the lessee may pay the additional royalties assessed at any time after receipt of an **audit billing notice.**
   TEX.NAT.RES.CODE ANN. § 52.135 (emphasis added).

2. Section 52.139(c) provides:
   This section shall not preclude the commissioner from conducting subsequent **audits or examinations** covering the same issues, time periods, and leases in cases where fraud exists or where the first audit deficiency assessment results only from an **examination** of documents, records, or reports submitted to the commissioner and not from a complete **audit** of the books, accounts, reports, or other records of a lessee.
   TEX.NAT.RES.CODE ANN. § 52.139(c) (emphasis added). Section 52.140(a), entitled "**Audit** Information Confidential," provides in pertinent part: "All information secured, derived, or obtained during the course of an **inspection or examination** of books, accounts, reports, or other records, as provided in Section 52.135 of this code, is confidential...." *Id.* § 52.140(a) (emphasis added).

adjudicating the rights of the parties to a mineral lease exceeds the statutory authority granted to the agency.

The Court fails to even address the plain meaning of the word "audit." The Court supports its erroneous construction of the statute by examining the legislative history of the amendments. However, by doing this, the Court ignores the fundamental precept that the legislative history of a statute is to be examined only when the statute is ambiguous. *Cail v. Service Motors, Inc.*, 660 S.W.2d 814, 815 (Tex.1983). This statute is not ambiguous, and therefore the legislative history of the enactment does not need to be examined. Nonetheless, an examination of the history of this statute actually supports my interpretation of its meaning rather than the majority's interpretation.

As discussed previously, before 1986 the GLO had to request the attorney general to file suit to collect a deficiency. The GLO had initiated an audit deficiency assessment program to cut through the inefficiency of this system, and the legislature later provided statutory authority for the assessments. However, nothing in the amended statutes expands the examination powers of the GLO; the statutes only change the procedure used to collect deficiencies. This is clearly evidenced by the fact that the "inspection and examination" portion of § 52.135 was not amended at all—the statute just added collection mechanisms. *Compare* Act of June 19, 1975, 64th Leg., R.S., ch. 635, § 2, 1975 Tex.Gen. Laws 1939 *with* Act of Sept. 17, 1986, 69th Leg., 3d C.S., ch. 5, 1986 Tex.Gen.Laws 4. The Court asserts that this interpretation of the statute cannot be correct because the GLO has had the power to review for accounting-type errors since 1919, and my interpretation would thwart the legislative purpose behind the amendments. The Court ignores that the basic purpose behind the statutes was to aid in the efficiency of collection. If the legislature had intended to expand the scope of the permissible inspection and examination, it would have amended that portion of the statute. The legislature did not, and we should not be rewriting the statute.

The other arguments of the Court in support of its reading of the statute are likewise unpersuasive. The Court argues that § 52.135(c), which provides that a lessee requesting a hearing must set out factual and legal grounds for its disagreement with the assessment, somehow evidences a legislative intent to allow the GLO to make legal determinations in the examination and the hearing. This provision may allow the GLO to make some preliminary legal determinations at the hearing, but the statute does not say anything about allowing the GLO to make legal determinations at the examination stage. A proper reading of the statute in its entirety mandates the conclusion that the GLO's examination is limited to accounting-type errors, but that the lessee's response to the assessment issued based on the examination can include both legal and factual matters. It only makes sense that a lessee should bring all of its challenges to an assessment at the hearing in front of the GLO rather than waiting to bring up legal arguments in the trial de novo. However, it does not follow that the GLO is allowed to interpret contracts in new ways at an inspection and then is allowed to uphold its interpretation of the contract at a hearing. The statute gives the GLO the power to make certain legal contentions at the newly-created procedure for hearings; it does not change the GLO's inspection and examination powers since this portion of the statute was not amended.

For all of the above reasons, I cannot join in the Court's opinion but I do join in the judgment.